Frank P. SLATTERY, Jr., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–280C.

United States Court of Federal Claims.

Feb. 10, 2006.

574

Thomas M. Buchanan, Winston & Strawn, LLP, Washington, D.C., for plaintiffs. Eric W. Bloom and Peter K. Dykema, Winston & Strawn, LLP, Washington, D.C., of counsel.

F. Jefferson Hughes, with whom were David M. Cohen, Director, Stuart E. Schiffer, Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice. John N. Kane, Jr., William G. Kanellis, Edward P. Sullivan, Commercial Litigation Branch, of counsel.

### OPINION

SMITH, Senior Judge.

This case is a hybrid of the *Winstar* line of cases, the background of which is well described in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), and is presently before the Court after a three week trial on damages. For the reasons set forth in the transcript at the damages trial, Defendant's motion for summary judgment was denied. At the conclusion of the trial, this Court entered an order requiring the parties to answer a series of eighty-eight (88) questions regarding damages. The parties suggested supplemental

questions and the Court issued a second order listing one hundred thirty-eight (138) questions, which included both the original and supplemental questions. In addition to the answered questions, the parties filed post-trial briefs. Closing arguments were held thereafter. Since that time, several cases have been decided by the Federal Circuit regarding damage calculations in *Winstar* related cases that are instructive to the case at hand. The parties have submitted motions for leave to file supplemental authority with these additional cases and their respective responses thereto. Because the Court finds the supplemental authorities instructive to this case, the Court hereby GRANTS the motions for leave to file supplemental authority. This opinion takes into consideration damages trial testimony, exhibits, post-trial briefs, answers to the questions presented in the Court order, closing arguments, and supplemental authorities. For the reasons stated herein, Plaintiffs are awarded damages in the amount of $371,733,059.

## LIABILITY HOLDING

In its previous opinion, this Court found the Federal Deposit Insurance Corporation ("FDIC") liable for breaching its 1982 Memorandum of Understanding ("1982 MOU") with Meritor Savings Bank ("Meritor").[1] Specifically, this Court held: (1) the FDIC liable for violating the terms of its 1982 MOU with Meritor regarding how the goodwill arising from Meritor's merger[2] of Western Savings Fund ("Western") would be treated for regulatory purposes; (2) that the FDIC violated the agreement when it forced Meritor to enter the 1988 Memorandum of Understanding ("1988 MOU") requiring Meritor to obtain higher capital levels than its peers, and when it failed to do so, to quickly raise $200 million in tangible capital that directly lead to the sale of 54 of Meritor's best

branches and other assets; (3) that the FDIC breached the 1982 MOU when it forced Meritor to enter a 1991 Written Agreement after satisfying the terms of the 1988 MOU[3]; and (4) that the FDIC breached the 1982 MOU when it removed Meritor's FDIC insurance on December 11, 1992 which directly led the Secretary of the Pennsylvania Department of Banking to close the bank. *Slattery v. United States,* 53 Fed.Cl. 258 (2002) ("*Slattery I*"). The Court noted that "but for the FDIC's fixation on Meritor's goodwill levels and its effect on the exposure of the [Bank Insurance Fund] to depositor claims if the bank failed, Meritor would not have been required to enter the 1988 MOU and 1991 Written Agreement," nor sell its best assets thus leading to its demise. *Id.* at 261.

## BACKGROUND

The background presented here comes from the Court's findings in *Slattery I,* and is not comprehensive. Instead, the background is a summary of the contract, breach, and resulting actions intended to put the damages claims in context. Additional factual findings, as necessary, will be discussed as the Court addresses Plaintiffs' and Defendant's arguments.

Meritor was organized in 1816 as a mutual savings bank and operated in Pennsylvania until its seizure. It was known as the Philadelphia Savings Fund Society ("PSFS") until 1985, and the Philadelphia branches of the bank retained that name until the seizure of Meritor. In 1981, Meritor was a thrift with $7.5 billion in assets. In 1982, Meritor entered into a contract with the FDIC in conjunction with Meritor's merger with Western. At the time, Meritor did not need to merge with Western, however, the FDIC would have closed Western but for the merger. If Western had been closed by the

---

1. For ease of reference, the Court will use the term "Meritor" to refer to both the Pennsylvania Savings Fund Society and Meritor Financial Group. PSFS changed its name to Meritor in 1986.

2. Even though the transaction was referred to by all parties as a merger, the transaction more closely resembled an acquisition.

3. The 1991 Written Agreement imposed even higher capital standards on the bank and Meritor could not meet those standards once the FDICIA prohibited the FDIC from counting goodwill as Tier One capital.

FDIC, the estimated cost to the Bank Insurance Fund ("BIF") was at least $696 million. Therefore, instead of closing Western the FDIC provided assistance to Meritor to facilitate the merger thereby limiting the cost to the BIF to $294 million. Extensive negotiations took place between the FDIC and Meritor regarding what the terms of assistance would be. Certain items were considered essential including the requirement that the difference between Western's assets and liabilities would be treated as goodwill on Meritor's books. The FDIC benefited because the BIF was protected from immediately paying Western's deposit holders.

By late 1985, Meritor had grown into a $17 billion financial services entity and had $19 billion in assets at its peak in 1987. Thereafter, the financial markets deteriorated significantly. This deterioration caused the FDIC to become concerned with Meritor's underperforming assets and Western goodwill, and their possible threat to the BIF. Therefore, in 1988, Meritor was forced to enter into the 1988 MOU, which required Meritor to increase its tangible assets by the end of 1988. If Meritor could not meet the new asset requirement, it would have to infuse $200 million in capital by March 31, 1989. To comply with the new requirements, Meritor was forced to sell fifty-four of its most profitable branches. The remaining assets, however, continued to trouble the FDIC as a large percentage were nonperforming loans and other assets that produced large losses for the bank. The FDIC continued to focus on the Western goodwill because it would provide no protection to the BIF and should, in the FDIC's view, be ignored. This conclusion, of course, violated the 1982 MOU. As a result, the FDIC again increased the capital requirements on the bank in the 1991 Written Agreement. Meritor could not meet the new 1991 capital requirements and was seized on December 11, 1992. In the long run, the FDIC benefited because it made a profit when Meritor was seized. The benefit was very different from the large losses the FDIC would have been faced with if it had seized Western in 1982.

Thereafter, Frank Slattery and the other Plaintiffs brought this suit as a shareholder derivative action to recover damages sustained by himself and similarly situated shareholders when the Pennsylvania Secretary of Banking seized Meritor. Plaintiffs claim that they were damaged as a result of the FDIC's breach of contract, and advance four theories. These theories are: (1) Reliance/Cost of Performance; (2) Wounded Bank; (3) Expectancy; and (4) Restitution Damages. The Court will address each of these in turn.

### Standard of Reasonable Certainty

The amount of damages need not be absolutely certain. Rather, "if a reasonable probability of damage can be clearly established, uncertainty as the amount will not preclude recovery.... The amount may be approximated if a reasonable basis of computation is afforded." *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960). As the *Locke* Court further noted, "[d]ifficulty of ascertainment is not to be confused with right of recovery." *Id.* The plaintiff can satisfy the certainty requirement with regard to the amount of damages "if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." *Id.* (citing *Stern v. Dunlap Co.,* 228 F.2d 939 (10th Cir.1955)).

### DISCUSSION

### I. Reliance/Cost of Performance Damages

The central idea behind reliance damages is that "a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Glendale Fed. Bank, F.S.B. v. United States,* 239 F.3d 1374, 1382 (Fed. Cir.2001). "As a general proposition, these damages are available for injuries resulting from activities that occurred either before or after the breach." *Id.* at 1383. (citing Calamari & Perillo, The Law of Contracts § 14.9 ("[A] party may recover expenses of preparation of performance, as well as other foreseeable expenses incurred in reliance upon the contract.")) However, the Federal Circuit has specifically rejected *Winstar* related damage claims based upon the excess of lia-

bilities assumed over assets acquired. *Cal. Fed. Bank, F.S.B. v. United States,* 245 F.3d 1342, 1351–52 (Fed.Cir.2001); *Glendale,* 239 F.3d at 1381–82. Instead, it has been held that a party's reliance interest is equal to "the total amount of cash spent in [managing the acquired thrift], less the total amount of cash received." *Glendale,* 54 Fed.Cl. at 13–14; *see also LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1374 (Fed.Cir. 2003). Similarly, a reliance claim will fail if the alleged costs are "incurred as a result of the acquisitions, not as a result of the breach." *Granite Mgmt. Corp. v. United States,* 416 F.3d 1373, 1380 (Fed.Cir.2005). Additionally, reliance damages must be foreseeable consequences of the breach as well as caused by the breach. *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1334 (Fed.Cir.2005).

 "The proper inquiry is whether the breach, among factors that may be shown to have had a role in producing [Plaintiffs'] damages, was a 'substantial factor' in causing those damages." *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 159–60 (2002). The "substantial factor" test has been used in other *Winstar* cases. *Bluebonnet Sav. Bank, FSB v. United States,* 47 Fed.Cl. 156, 173 n. 75 (2000) *rev'd on other grounds* 266 F.3d 1348 (Fed.Cir.2001). "In the context of reliance damages," causation "refers to Plaintiff's burden showing that its … expenditures were incurred as a result of the contract." *Westfed,* 52 Fed.Cl. at 155. In general, it seems clear to the Court that after Meritor agreed to assume responsibility for Western, everything it did to manage those assets would be expenditures incurred as a result of the contract. The Defendant, therefore, bears the burden of proof that any items spent in connection with managing Western were not pursuant to the contract.

In this contract the parties had negotiated an Income Maintenance Agreement ("IMA") that guaranteed a market rate of return on the Western assets, but it did not apply to "independent business decisions," *i.e.,* the subsequent sale of those assets. The Government claims that the decision to sell these assets meant that they were no longer protected by the IMA scheme and that this was the cause of Meritor's loss, rather than the subsequent breaches. *See* Def. Br. at 15.[4] Additionally, the Government claims that since 91% of the $687.8 million cash loss claimed from Western was incurred prior to the 1988 MOU, the Plaintiffs have not established causation. Plaintiffs disagree and claim that they would have recouped these losses "through earnings" had the breach not occurred. Pl. Supp. at 13. It is clear to the Court that causation has not been proven with respect to this reliance claim.

Relying on *Granite,* the Government claims that rather than Plaintiffs demonstrating that their claimed reliance damages were caused by the FDIC's breach, Def. Mot. at 2,[5] they have instead espoused expert witness models showing the opposite. *See* Def. Ans. 39, 73, 75–76, 83. Defendant further asserts that Mr. Brummett's model evidences that virtually all ($630.14 million) of his cost of performance losses were incurred in the years before the 1988 breach. PX 854 at Ex. A.1. In addition, the Government alleges that Dr. Goldstein's "but-for" model of a nobreach Meritor would still result in losses. Specifically, from 1988–91 the losses would be $650.9 million with a cumulative net loss of $241.6 million for the years 1988–1997 (the remaining years of the parties' contract.) Thus, the Government contends that the Plaintiffs have not demonstrated that any of its losses would have been recovered during the contract term in the absence of a breach. Def. Reply Mot. at 3. However, the Court does note that Dr. Goldstein projected profits starting in 1997. The Government asserts that the numbers relied upon by Dr. Goldstein to determine this profit show that it would take 62 years for Meritor to recoup the $630.14 million in pre-breach losses, even if the bank remained at the same profitability each year. *Id.* Therefore, the Government asserts that Plaintiffs' own evidence dis-

4. "Def. Br." and "Pl. Br." refer to the respective party's post trial memoranda regarding damages. "Pl. Supp." refers to Plaintiffs reply to Defendant's post trial memorandum.

5. "Def. Mot." refers to Defendant's Motion filed on August 26, 2005. "Def. Reply Mot." refers to Defendant's reply filed on October 5, 2005.

proved causation of its reliance damages as the models demonstrated cumulative losses in the amount of $870 million for the years 1982–1997, regardless of the breaches, rather than proving any recovery of the reliance expenditures. Def. Mot. at 4. The Court questions some of the Government's analysis of Plaintiffs' expert reports, however, it is clear that it raised serious reliability concerns with the Plaintiffs' proof on this claim. The model provided by Mr. Brummett clearly indicated that almost all of his cost of performance losses were incurred in the years before the 1988 MOU and did not prove that any of these costs would be recovered prior to the contact's expiration. Hence, Plaintiffs' reliance claim must fail because it has not been proved.

## II. Wounded Bank Damages

■ Wounded bank damages are a form of incidental reliance damages that arise from the harm to the institution resulting from the breach. Specifically, " '[w]ounded bank' damages are costs incurred by the thrift because of its status as a 'troubled' or under-capitalized institution—a status directly related to FIRREA's mandated removal of goodwill from the thrift's regulatory capital." *S. Cal. Fed. Sav. & Loan Ass'n v. United States,* 57 Fed.Cl. 598, 624 (2003) *rev'd on other grounds* 422 F.3d 1319 (Fed.Cir.2005).

■ As noted above, wounded bank damages are a form of reliance damages and, therefore, must not be speculative. The burden of establishing the damages is on the plaintiff. As the Federal Circuit stated:

> [R]ecovery based on the reliance interest is the real costs incurred for capital and services that the thrift would not have incurred but for the contract and its subsequent breach. Whether in a given case this properly includes the higher costs to a thrift of conducting its general business after FIRREA—the "wounded bank" claim—is a matter of proof; if too speculative, it can and should be denied as the burden lies with the plaintiff to establish its damages.

*Glendale,* 378 F.3d at 1311–12.

The Plaintiffs seek wounded bank damages that can be grouped into two categories.

The first category includes the costs of the divestment transactions themselves. The Plaintiffs identify the following damages in this category:

1. Transaction costs for the sale of Meritor Credit Corporation—$3,000,000

2. Deferred Marketing Expenses for the Student Loan Portfolio Sale—$800,000

3. Transaction Costs for the sale of the 54 branches—$15,233,000

4. Fees paid to World Savings to buyout the recourse provision on the mortgages sold—$1,800,000

In the second category, which includes various consulting fees allegedly caused by the breach, the Plaintiffs identify fees paid to:

1. First Boston—$3,365,254

2. Furash & Co.—$193,199

3. Bankers Trust Co.—$3,775,369

4. Shearson Lehman Hutton—$151,237

5. Retention Payment to L. Betsinger—$75,000

Although the Plaintiffs calculate these damages as $28,394,000, the Court's calculation of these expenses comes to $28,393,059.00. The Court will address each of these claims individually.

### A. Divestment Transactions

It is undisputed that Meritor intended to downsize in the late 1980's. To that end, Meritor developed the Philadelphia Plan, which set forth a means of reducing Meritor's assets from $18.652 billion to $17.758 billion. PX 109 at CSL0082000; Pl. Br. at 22 n. 8. As Mr. Hillas testified, the plan constituted "a relative handful of moves of consolidation and efficiency and the sale of small units that weren't material to the corporation. They were a grouping, and that was called the Philadelphia Plan." Dmgs. Tr. at 1339–13. The Government, however, argues that Meritor would have had to massively downsize in order to remain in compliance with minimum capital requirements. The Government contends, therefore, that the Plaintiffs are entitled to no wounded bank damages because the assets would have been sold even in the absence of the 1988 MOU. To support this, the Government states that

Meritor would lose at least $252 million in regulatory capital by the maturing of the FDIC note and an additional $106 million because of the amortization of goodwill at $53 million per year over two years. Dmgs. Tr. at 2620–22.

Meritor was a thriving financial institution prior to the Western merger and would not have faced economic collapse but for the contract with the FDIC and its subsequent breach. There is also no evidence whatsoever that Meritor would have attempted to downsize by divesting its best assets. The Court sees no reason that causation for determining wounded bank damages would be any different than for expectancy damages.

### 1. Transaction Costs for the Sale of Meritor Credit Corp.

The sale of the Meritor Credit Corp. generated $3 million in transaction costs that the Plaintiffs assert they are entitled to recover. PX 759 at CSL008 2487. Although the prospect of selling Meritor Credit had been addressed prior to the 1988 MOU, the proposal had a hand-written "N.G." (indicating "no good") written next to it. PX 109 at CSL008 1994. Further, Meritor's advisors recommended against the sale of Meritor Credit. DX 1267 at CSL027 1253. The Government contends that Meritor's dire financial condition in the late 1980's would have forced it to sell Meritor Credit regardless of the breach, therefore, the costs are not recoverable. The Court finds that the sale of Credit Corp. was caused by the 1988 MOU and that the Plaintiffs are entitled to recover the $3 million in costs generated from this sale.

### 2. Student Portfolio Sale Expenses

Plaintiffs also seek $800,000 for the costs stemming from the sale of the student loan portfolio. PX 754 at CSL001 0848. Meritor initiated the sale of the student loan portfolio in order to comply with the 1988 MOU. There is no mention of this sale in the Philadelphia Plan. *See* PX 109. The sale was first addressed in the September 1988 Capital Plan, which was "developed as a framework for complying with the regulatory capital requirements stated in the FDIC Memorandum of Understanding." PX 178 at CSL013 0131, 0135. Because this expense was the result of Meritor's attempt to comply with the 1988 MOU, the Plaintiffs are entitled to recover $800,000 in costs associated with the sale.

### 3. Transaction Costs for the Sale of the 54 Branches

The largest wounded bank claim is for the $15,233,000 in transaction fees resulting from the sale of the 54 branch offices. PX 855 at Ex. D. As discussed above, the Government argues that Meritor would have been forced to sell these branches regardless of the breach. Meritor asserts that in the non-breach world it would have been able to downsize by rolling off assets. According to Mr. Hillas, "if the goodwill were capital, you would have runoff assets as they matured and lowered your liabilities as you no longer needed to support the assets that had runoff.... That is the normal way to bring down, not abruptly sell half the company." Dmgs. Tr. at 1304. The Court addressed this issue in the liability opinion, where it stated that "absent the increased capital levels in the 1988 MOU, Meritor would not have sold the 54 branches as it did. Further, the Court finds that the sale of those branches led to the rapid decline in Meritor's capital ratios because the remaining assets earned less income and were riskier than those Meritor had sold." *Slattery I,* 53 Fed.Cl. at 283.

The Government is not persuasive when it asserts that Mr. Hillas's testimony in the liability trial admitted that Meritor would have sold at least 27 branches without the MOU. During the liability phase of the trial, Mr. Hillas stated that: "Instead of 54 branches, you could have gone 27." Liab. Tr. at 720. Although the government does not cite to it, that statement continues, "that's a for instance." *Id.* That this statement was intended as a hypothetical is further supported by the government's follow-up question, which was "I take it your testimony is that if the 1988 MOU requirement had not existed, you could have, for example, sold 27 branches...." *Id.*

Because Meritor sold the 54 branches in order to comply with the 1988 MOU, the Plaintiffs are entitled to recover the $15,233,000 transaction costs of the sale.

#### 4. Fees paid to World Savings to buyout the recourse provision on the mortgages sold

Plaintiffs' claim that the $1.8 million in costs resulting from the buyout of recourse provisions in mortgages Meritor sold should be recoverable as well. PX 754 at CSL001 0849. As with several of the other costs already addressed by the Court, there was no indication prior to the 1988 MOU that Meritor had any intention of having to buyout these recourse provisions. In December 1988, Meritor decided to initiate this transaction to comply with the 1988 MOU. *Id.* Because Meritor entered this transaction as a result of the 1988 breach, the Plaintiffs are entitled to recover the $1,800,000 in costs associated with the transaction.

### B. Consulting Services

The Plaintiffs also seek relief for certain advisory fees resulting from the breach. Assuming these services would not have been incurred but for the breach, Plaintiffs would be entitled to recover. Each cost will be addressed in turn.

#### 1. First Boston

The Plaintiffs seek to recover the $3,365,254 that Meritor paid to First Boston for consulting services. *See* PX 780. The Government disputes that First Boston's services were the result of the breach, pointing to the testimony of Dr. Hamm, who found that none of the engagement letters included services that were a result of the breach. Dmgs. Tr. at 2642–44. Plaintiffs counter that First Boston performed as a primary advisor helping Meritor comply with the 1988 MOU. Pl. Ans. 84. Plaintiffs also asserts that First Boston prepared the 1988 Capital Plan, analyzed and prepared divestitures, and met with prospective buyers. PX 178 at CSL013 0131; PX 735; PX 749; PX 753 at CSL080 0083; PX 766. Further, Plaintiffs expressly do not seek any recovery for expenses paid to First Boston in 1988, only services that were performed in 1989. PX 780. The extent of the Government's review, however, appears to be a review of the engagement letters, while Plaintiffs presented significant evidence that First Boston was performing services that were directly caused by, and resulting from, the breach. Therefore, the Court finds that the Plaintiffs are entitled to recover the fees paid to First Boston for services to bring Meritor into compliance with the 1988 MOU, in the amount of $3,365,254.

#### 2. Furash & Co.

Plaintiffs seek to recover $193,199 paid to Furash & Co. to assist Meritor comply with the 1988 MOU. PX 855 at Ex. D.1. The Government notes that there were two engagement letters with Furash, one that dealt with strategic planning and one that provided for assistance to Meritor regarding the 1988 MOU. The Government argues that the first letter clearly has nothing to do with the 1988 MOU as it involved "strategic planning." Dmgs. Tr. at 2646–48. The second letter included services for complying with the 1988 MOU, but the Government argues that even these expenses are not recoverable because the 1988 MOU dealt with both breach and non-breach matters. Def. Ans. 84. Therefore, according to the Government, the Plaintiffs cannot recover this full amount because not all of the expenses were caused by the breach. The Court does not accept that characterization of the 1988 MOU. The MOU that was signed in 1988 was directed to altering, or in fact breaching, the 1982's critical capital provisions. This is what generated the need for expert help. As with First Boston, Meritor provided significant evidence that Furash was providing services directly resulting from the 1988 MOU. As shown by a June 1988 invoice, Furash provided counseling regarding the 1988 MOU beginning in April 1988. PX 734. Furash then began formulating plans for Meritor to comply with the 1988 MOU. PX 742; PX 745; PX 746; PX 762; PX 780. Because the services that Meritor is seeking to recover payment for are clearly the result of the 1988 MOU, the Plaintiffs are entitled to recover the fees paid to Furash in the amount of $193,199.

#### 3. Banker's Trust

The Plaintiffs seek $3,775,369 in wounded bank damages to compensate for the fees paid to Banker's Trust. This total consists of $2,000,369 for services provided in 1989, PX 780, $600,000 for "good bank/bad bank" advisory services through May 1992, PX 806 at

CSL071 0132, and $1,175,000 for advisory services relating to the sale of Meritor FA. PX 400; PX 814.

The Government again asserts that there is no indication in the engagement letters to indicate that Banker's Trust provided any services related to the 1988 MOU. Further, the Government contends that Meritor would have had to hire Banker's Trust to perform the same services in the no breach world. Therefore, according to the Government, there can be no wounded bank recovery for these expenses. The problem with this argument is that it disregards the impact of the 1988 MOU on Meritor.

Plaintiffs respond by arguing that Dr. Hamm conceded that he could not state that Meritor would have hired any outside consultants in a no-breach world, only that Meritor would be justified in hiring such consultants. Meritor further shows that Banker's Trust provided services to Meritor specifically intended to bring Meritor into compliance with the 1988 MOU. PX 201 at 1; PX 216; PX 400. Meritor retained Banker's Trust to "enhance [its] capital structure" to comply with the 1988 MOU's capital requirements. PX 201. There was then a revised engagement in August 1989 that covered the creation and implementation of a capital plan, assisting Meritor with the FDIC, and continuing evaluations of capital alternatives. PX 215; PX 216. Banker's Trust also provided services in the sale of Meritor FA. PX 400; Dmgs. Tr. at 7013–17. Because the Plaintiffs have shown that the services provided were caused by the 1988 MOU, the Court finds that the Plaintiffs are entitled to recover $3,775,369.

#### 4. Shearson Lehman Hutton

Plaintiffs also seek to recover $151,237 paid to Shearson Lehman for services allegedly resulting from the 1988 MOU. PX 780. The Government contends that the services provided were those commonly provided to thrifts in the normal course of business and that they are, therefore, unrecoverable. DX 1661; Dmgs. Tr. at 2657–59. The Plaintiffs contend that Shearson was retained to "provide advice on strategic alternatives, including the sale of some or all of the branch franchise and other transaction opportuni-

ties." Pl. Ans. 84; PX 756. The Plaintiffs also point out that these services were listed in the monthly compliance reports on Meritor's compliance with the 1988 MOU requirements. PX 759 at CSL008 2482; Pl. Ans. 84. Because Shearson was retained to provide services to assist in bringing Meritor into compliance with the 1988 MOU, the Court finds that the Plaintiffs are entitled to recover $151,237.

#### 5. Retention Payment to L. Betsinger

The final wounded bank claim is for $75,000 paid to Mr. L. Betsinger. According to the Plaintiffs, Mr. Betsinger was retained by the bank to provide advice regarding the possible sale of part of the bank's internal data processing. Dmgs. Tr. at 151. Mr. Batsinger was one of the advisors that actually provided services relating to the sale of that function to EDS. *Id.* The Government does not rebut the Plaintiffs' claim. Finding that the services were incurred a result of the breach, the Court awards Plaintiffs $75,000 for this expense.

### III. Expectancy Damages

It is well settled that the law provides that a non-breaching party may be made whole by damages representing the benefits they reasonably expected to receive if the breach had not occurred. *Cal. Fed.,* 245 F.3d at 1349; *Glendale,* 239 F.3d at 1390 (citing Restatement (Second) of Contracts § 344(a)(1981)). Expectancy damages are often equated with lost profits, although they can include other damage elements as well. *Cal. Fed.,* 245 F.3d at 1349 (citing Restatement (Second) of Contracts § 347 (1981)). Here, Plaintiffs are not seeking lost profits. Instead, they seek expectancy damages based on the value of Meritor as of the dates of the first and third breaches, that is, August 1, 1988 and December 11, 1992. Pl. Ans. 3. For the first breach, Plaintiffs' valuation is based on the market capitalization of the institution as of that date plus a 50% premium. For the December 11, 1992 breach, Plaintiffs' calculation is based on a valuation of Meritor's assets and liabilities in liquidation, with certain adjustments. The Government asserts that Plaintiffs are not entitled to recovery because the damages are too speculative as a

matter of law as they cannot be reconciled with historical performance.

■ A party can recover expectancy damages "provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Savings Bank, FSB v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) (quoting Restatement (Second) of Contracts §§ 347, 351, 352 (1982)). Foreseeability requires that both the type and amount of damages claimed were, at the time of contract formation, foreseeable consequences "in the ordinary course of events" of the breach. Restatement (Second) of Contracts § 351; *see also Bluebonnet,* 266 F.3d at 1355. Plaintiffs bear the burden of proof. *See N. Helex Co. v. United States,* 207 Ct.Cl. 862, 876, 524 F.2d 707 (1975). With respect to causation "the proper inquiry is whether the breach, among the factors that may be shown to have had a role in production [Plaintiffs'] damages, was a 'substantial factor' in causing those damages." *Westfed,* 52 Fed.Cl. at 159–60. And lastly, Plaintiffs must prove damages with reasonable certainty. *Bluebonnet,* 266 F.3d at 1355. Thus, Plaintiffs' damage model relied upon must not be based on mere speculation or hypotheticals. *Franklin Fed. Sav. Bank v. United States,* 55 Fed.Cl. 108 (2003); *Willems Indust., Inc. v. United States,* 155 Ct.Cl. 360, 295 F.2d 822 (1961).

### A. Foreseeability

■ Here, the question is whether regulators foresaw, or should have foreseen, at the time of contract formation, that breaching the "goodwill" portion of their contract with Meritor would have resulted in a significant or total loss of Meritor's net worth or market value. Plaintiffs bear the burden of proof, and the Government claims that Plaintiffs failed to produce any evidence proving this. In addition, the Government argues that the Plaintiffs foreseeability assumption is belied by: (1) the failure of the market to recognize significant harm flowing from the breaches, or the branch divestitures; (if thousands of sophisticated investors foresaw no harm at the time of the breaches, it necessarily follows that regulators could not

have foreseen the type and amount of harm Plaintiffs now claim), Dmgs. Tr. at 1456–61; (2) Meritor itself was economically insolvent on a market value basis at the time of contract formation, Def. Ans. 15, 11, 40, precluding the foreseeable loss; (3) relatedly, Meritor was a mutual, not a stock, institution at the time of the contract, and Meritor's $171 million market capitalization in 1988 was the result of its post-contract conversion and the injection of millions of dollars by new shareholders, which regulators did not foresee, *see* Dmgs. Tr. at 2697, 2699, 2713; and (4) regulators imposed higher capital requirements to make Meritor safer, not to cause its decline and ultimate seizure as claimed by Plaintiffs, precluding foreseeability. Def. Br. at 26.

The Government is not persuasive when it makes the assertion that it was unforeseeable at the time of contract formation that the breaches would lead to the loss of Meritor's net worth or market value. As noted in the Court's liability opinion, Meritor was a thriving bank prior to its merger with Western. Indeed, Meritor was having problems of its own as a result of the high interest rate environment, but it was still recognized as a strong thrift by the FDIC. *Slattery I,* 53 Fed. Cl. at 260. At the time of the merger, the FDIC and Meritor engaged in extensive negotiations about what the terms of the merger would be, including critical items. One such item was the requirement that the difference between Western's assets and liabilities would be treated as goodwill on Meritor's books. *Id.* If it had not been treated as such, Meritor would have been in an unsound position the minute the two thrifts merged because of the absorption of Western's liabilities. This made the goodwill provision one that made the deal possible. The deal would not have occurred without it. The regulators clearly understood this. William Issac, chair of the FDIC at the time the 1982 MOU was signed, played a key role in developing the FDIC's goodwill strategy and oversaw the Western/Meritor merger. The 1982 MOU included an agreement about what accounting methods Meritor would use to calculate its capital for regulatory purposes, specifically "Meritor may treat '[t]he difference between the liabilities assumed and the total of

the market value of the Western assets, less reserves, ... as goodwill and amortize[ ] [the goodwill] on a straight-line basis up to fifteen (15) years.'" *Id.* at 259, 263–64.

Meritor grew to its peak of assets in 1987 when it had $19 billion in assets. Thereafter, because the financial markets continued to deteriorate, the FDIC became increasingly uncomfortable with the perceived threat that Meritor's underperforming assets and Western goodwill were to the BIF. Thus, the 1988 MOU was imposed upon Meritor requiring Meritor to infuse $200 million in new capital. And as noted earlier, the only plausible way to do so, was for Meritor to sell fifty-four of its best branches. It is clear to the Court that it was foreseeable under the circumstances that the heightened regulatory requirements would require Meritor to find alternate means of financing required for the capital infusions and that by forcing Meritor to sell fifty four of its most profitable branches to reach the new levels the result would be its demise. In addition, by forcing Meritor to enter into the 1991 Written Agreement, requiring even more capital, it is clear to the Court that it was foreseeable that Meritor would not be able to survive.

## B. Causation

The Government argues that Plaintiffs' causation assumption implicitly assumes that even though Meritor was facing other difficulties up to and after the 1988 MOU, the breach damage caused a decline in value that was 61 percent greater than Meritor's actual August 1, 1988 market capitalization. The Government argues against this assumption due to (1) Meritor's historical performance which declined substantially before the breach, Dmgs. Tr. at 1437; Def. Ans. 3, 4, 8, 17, 18, 19; *see also Suess v. United States,* 52 Fed.Cl. at 226–27; (2) Meritor's severely troubled operating condition and its operating losses, both before and after the breach for reasons unrelated to the breach, Def. Ans. 3, 4, 6, 8, 17–20, 73–75; Dmgs. Tr. at 1433–55; (3) Plaintiffs concession that Meritor would have shrunk by $10 billion, and sustained an additional $400 million in losses between 1989–91, absent the breach, PX 541A, Ex. 1 at 1–2 [Goldstein Model]; Dmgs.

Tr. at 1075–77, 1118, 1123; and (4) Meritor's independent business decision to forego capital raising from existing shareholders or new investors. Dmgs. Tr. at 1462–68; *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1071 (Fed.Cir.2001) (independent business decisions break causation chain). Because Meritor survived for almost four-and-a-half years after the 1988 breach, and because Meritor's relatively small decline in market value after each breach, the Government contends other forces than the breaches were at work. In addition, external economic conditions caused the performance of Meritor and other banks to deteriorate from May 1988 to December 1992. *See* Def. Ans. 5C, 6; Def. Br. at 25.

The Court finds that the Government's assertion that Meritor's loss of equity after August 1, 1988 was not caused by the breaches but by poor quality assets, poor liquidity and operating problems, unpersuasive. This is like saying that a victim of a gunshot dies from loss of blood not the gunshot. As this Court stated in its prior opinion on liability, the sale of the 54 branches effectively "doomed the bank," led to an asset deterioration, which led to the 1991 Written Agreement, and in turn, led to a "downward death spiral" for Meritor. *Slattery I,* 53 Fed.Cl. at 285. The Government's own witness, Dr. Thakor admitted that each asset sale pursuant to the 1988 MOU caused Meritor's liquidity and quality of assets to deteriorate and the stock prices to decline. Dmgs. Tr. at 1452–21, 1967–69. In addition, the Court finds that the Government's suggestion that Meritor would have "failed" in a no breach world is implausible. This is evidenced by Plaintiffs' witness, Dr. Brumbaugh, who established that if Meritor's goodwill were fully counted as regulatory capital, it would have been in compliance with both the standard and enhanced capital requirements during most of the 1985–1992 period. Dmgs. Tr. at 3399–3401; PX 1094. Even assuming there were periods of minor noncompliance (as cited by Dr. Thakor) it is clear to the Court that had Meritor's goodwill been counted, it would never have been required to sign the regulatory agreements or be seized. Therefore, the Court now turns to the question as

to whether the 1988 and 1992 valuations were proven with reasonable certainty.

## C. Reasonable Certainty

The Government asserts that Plaintiffs' expert witness, Dr. Finnerty did not do any modeling or analysis proving reasonable certainty as to damage. Defendant claims that instead, Dr. Finnerty simply assumed the loss of every dollar of Meritor's August 1, 1988 value, after the breach between 1988 and 1992, was the result of the breaches. Dmgs. Tr. at 113, 115–17, 1124. On this basis alone, the Government contends Plaintiffs failed to prove their 1988 damage claim.

Dr. Finnerty, expert witness for the Plaintiffs, calculated expectancy damages as of August 1, 1988 to be in the amount of $276 million. Dmgs Tr. at 991. To arrive at this sum, Dr. Finnerty performed two valuations and simply averaged the results, trying to allow for the possibility of leakage into the market. The concept of leakage, here, dealt with the fact that stock prices of Meritor were negatively impacted by articles indicating possible regulatory action against the bank.[6] First, Dr. Finnerty looked at the August 1, 1988, stock price for Meritor. That price was $4.88. Because he believed this price was tainted by the possible leakage, Dr. Finnerty took a 30 day average of the stock prior to that date. The amount arrived at was $5.44. This amount was then adjusted to reflect the change in the NAS-DAQ Bank Index between the middle of this period, May 5, 1988 and August 1, 1988 which had increased 3.4 percent.[7] Dmgs. Tr. at 1004–1006. Next, Dr. Finnerty multiplied the adjusted stock price of $5.44 by 1.034 arriving at $5.62, an amount Dr. Finnerty relies on to be the share price if it were not for the leakage taint. Dr. Finnerty then noted that on August 1, 1988 Meritor had roughly 35 million shares outstanding. He took the price of the stock, $4.88 and multi-plied it by the shares outstanding, thus finding market capitalization to be $171 million. However, to account for the taint, Dr. Finnerty multiplied the shares outstanding (35.06 million) by the adjusted stock price ($5.62) to arrive at an adjusted market capitalization of $197 million. *Id.*

Dr. Finnerty then applied a control premium. Plaintiffs claim that the control premium is justified because they are "almost always" paid in sales of a majority interest of a firm. Pl. Ans. 21. Dr. Finnerty testified that control premiums are paid for many reasons, including: (1) synergy between firms; (2) belief that an acquired can do better; (3) elimination of competition and (4) market share. Dmgs. Tr. at 1012–18; 1155–56; 3188–91; 3197–98. Plaintiffs offered evidence that established that under-performing institutions command higher than average control premiums and further confirm that firms with strong franchise values command higher premiums. *See generally* Finnerty Damages Testimony. Plaintiffs allege that there is a presumption that a control premium should be paid, especially for an under-performing firm with extraordinary franchise value. Pl. Ans. 24. Plaintiffs rely on the fact that the premium paid by Mellon in 1990 proves that Dr. Finnerty's 1988 valuation is reasonable, advancing the argument that since Mellon paid $336 million for only two-thirds of the institution (even though, Plaintiffs assert, Mellon was able to cherry-pick the better branches and assets) that transaction represents that Dr. Finnerty's valuation of the entire institution at considerably less is reasonable. Pl. Ans. 25. Defendant disagrees that a control premium should be applied. Defendant claims that control premiums are used only in an acquisition context. Def. Br. at 27. This seems illogical. A control premium is used in an acquisition because if one were to buy a company, one

---

**6.** Dr. Finnerty testified to the issue that's highlighted in articles concerning regulatory action related to Meritor's tangible position. *See* PX 868 *(Philadelphia Inquirer* article "For PSFS, No Quick Recovery") and PX 727 *(American Banker* article "Meritor Tries to Up Primary Capital").

**7.** Dr. Finnerty chose the NASDAQ Bank Index to ensure that any changes in Meritors' stock price during this 30 day period were due to the breach, not because of some other reason. The NASDAQ Bank Index was used because of its recognized reliability. Dmgs. Tr. at 1008–09. Dr. Finnerty further compared the stock price of Meritor with that of the NASDAQ Bank Index for an extended period of time to determine that they were closely correlated. *Id.* at 1009.

would then have control of the company. The stock price reflects only equity in a small portion of the company, but to value the whole company, it is logical to price in the control premium, which would amount to its total value. Dr. Finnerty used a fifty percent control premium relying on comparable bank transactions in the 1988 time frame. He then multiplied 1.5 by the total of Meritor's August 1, 1988 market capitalization of $171 million arriving at the sum of $256 million. Then, he multiplied the adjusted market capitalization of $197 million by 1.5 percent and arrived at the adjusted total value of Meritor's equity on August 1, 1988, to be $296 million. Averaging the two numbers together, Dr. Finnerty arrived at an adjusted market capitalization value of $276 million. Dmgs. Tr. at 1007–08.

The Court finds Dr. Finnerty's valuation regarding informational leakage to determine Meritor's pre-breach value to be sound. Although the Government agrees that the Court "needs to account for informational 'leakage' to determine the pre-breach value," Def. Ans. 20, it criticizes the May 19, 1988 date because the articles relied upon by Dr. Finnerty did not specifically mention the pending MOU. However, even the Government's witness Dr. Hamm acknowledged that "anybody who read the F4 report would understand that Meritor was discussing ... a primary capital requirement that exceeded the requirement for fundamentally sound institutions." Dmgs. Tr. at 3065–66. The evidence also showed that Dr. Finnerty took into account the public references to the non-breach related problems as these problems were disclosed to the public earlier and therefore the information was already reflected in Meritor's stock price. Dmgs. Tr. at 3208–22; Pl. Ans. 5.

Further, the Court finds that Dr. Finnerty's use of the NASDAQ Bank Index during the 30–day period prior to the breach appropriate. The analysis established that the NASDAQ Bank Index and Meritor's share price were positively correlated from 1986 through the breach in 1988. Dmgs. Tr. at 3169–72. The Court does not agree with the Government that this theory should fail because it "covers limited periods" and it instead should cover a longer period of time.

And lastly, the Court finds that the control premium used by Dr. Finnerty justified. While the Government contends that control premiums are justified only in an acquisition context, it is clear that an acquirer or seller would consider a control premium as part of calculating the value of a target company before acquiring it. When selecting a control premium in the investment banking world or the appraisal world, one looks to comparable transactions. Here, for comparability Dr. Finnerty looked to the control premium study database complied by MergerStat. From that database Dr. Finnerty selected particular institutions that were either thrifts or similar enough so that the control premiums were meaningful indicators. Dmgs. Tr. at 1011–13. The control premium study gives premiums in different time intervals, and Dr. Finnerty chose a one month time period to account for possible information flow. Id. at 1013–14. Dr. Finnerty also looked at control premiums for transactions that occurred between August 1, 1988 and the end of 1988 and found that for the first part of the year the average control premium was 50.36% and at the end of the year the control premium was higher at about 66%. Id. at 1014. He, therefore, chose the more conservative control premium and one that the Court finds to be appropriate and accurate.

Therefore, because the Court finds Dr. Finnerty's analysis persuasive. The Court finds the bank's value to be $276,000,000 in 1988 prior to the breach. The Court need not address the 1992 valuation since the value of the bank at the time of the first breach is the recoverable amount. The Plaintiffs appear to seek recovery of the value of the bank as of the second breach also. The Court assumes this claim is an alternative claim. If not, it would amount to a double recovery, once for the pre–1988 value and second for the 1992 value. This, of course, is not logical.

The Court awards the Plaintiffs $276,000,000 in expectancy damages because but for the breaches the stockholders would have had at least that amount of equity val-

ue. Any value lost in the receivership and liquidation process would not have been lost, but for the breach. If the breach had not occurred there would have been no receivership. Because Plaintiffs have recovered nothing from the receivership, they are entitled to the entire $276 million.

## IV. Restitution Damages

■ This Court believes that the facts of this case are significantly different from those in *Glendale*. *Compare Glendale*, 239 F.3d at 1382 ("[I]t is not at all clear that but for Glendale's purchase of Broward the Government would have been called upon to make up that deficit then and there.") *with* PX 861 at Admission 6 (stating that, in the event there was no merger, the FDIC "would have terminated Western's deposit insurance and that the State of Pennsylvania would have appointed a receiver to liquidate the institution"). Here, there does seem to be adequate support, by a preponderance of the evidence, that, but for Meritor's acquisition, the Government (here the BIF) would have had to pay out $696 million. As a result of Meritor's acquisition, the cost to the FDIC was reduced to $294 million (the Plaintiffs deny that the $294 million cost to the FDIC should count to offset this award). The assumption of Western's liabilities by Meritor clearly produced this $402 million saving. It is also clear that in this case the only alternative to Meritor's acquisition was the liquidation of Western. Thus, the Government clearly saved the $402 million cost and retained the ever accumulating interest on that saving for more than fourteen years. If this were the first case in the *Winstar* line, the Court would award this restitutionary remedy based upon the benefit conferred on the Government. However, it is not. The still evolving precedent in this area does not answer this question. On a practical level, the Federal Circuit has rejected some in-kind benefits provided to the Government, and affirmed restitution of only direct monetary payments by plaintiffs as part of contractual performance. It is the Court's opinion in light of these binding precedents that it would be presumptuous for the trial court to award restitution in light of this uncertainty. The number of restitutionary claims that

have come before the Court of Federal Claims and the Federal Circuit in this area are quite limited. Compared to the well developed body of contract or tax precedent produced by the Circuit the number here is extremely small. Therefore, this Court denies this claim, which allows the parties to fully brief and argue the matter before the Federal Circuit. This, to the Court, seems like a preferable course to the certification of this issue for appellate review.

### Non–Overlapping Restitution

■ The Plaintiffs seek to recover the following in restitution damages: 1) $696 million for the avoided cost of liquidation to the Government; 2) $2,066,702,000 for the "FDIC's Investment Earnings"; 3) $67,341 million for the "net payments to the FDIC and the Federal Reserve"; and 4) $112,171,-000 for the value of Meritor as of the seizure, for a total alleged benefit to the Government of $2,942,214,000. As noted in the expectancy discussion, the Court believes that the claim for Meritor's value as of the seizure is improper because of the expectancy award based on the 1988 valuation.

As noted above, the Federal Circuit has allowed restitution in Winstar cases when the measure is the actual cost to the Plaintiff. *E.g. Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1372 (Fed.Cir.2001) ("Thus, restitution restores to the non-breaching party the net loss that he suffered as a result of his performance under the contract."). To measure the net loss, the Court must calculate all of the costs to the Plaintiffs and subtract the value of benefits conferred by the Government. In this case, the benefits to the Plaintiffs included an amortizing promissory note in the amount of $125,197,000; the IMA in the amount of $33,746,000; a non-amortizing promissory note in the amount of $122,083,000; repurchased loans totaling $10,866,000; and cash the Government paid to settle Western's debt, in the amount of $108,125,000. The costs incurred by the Plaintiffs included a PSFS subordinated note in the amount of $359,232,000 and the repayment of debt to the Federal Reserve Bank in the amount of $108,125,000. When the costs are subtracted from the benefits, the net

587

result of these dealings is that Meritor paid the Government $67,340,000. The Court finds, therefore, that the Plaintiffs are entitled to recover Meritor's net payment to the Government of $67,340,000. This amount would, along with the value of the bank that the breach destroyed, put the bank in a position it could reasonably expect if the contract had been performed and not breached.

### CONCLUSION

For the reasons set forth above, Plaintiffs are **AWARDED** $28,393,059 in wounded bank damages, $276,000,000 in expectancy damages, and $67,340,000 in non-overlapping restitution damages for a total damages award of $371,733,059.

The parties are **DIRECTED** to contact the Judge's law clerk to set a date and time to discuss the remaining issues in this litigation.

**IT IS SO ORDERED.**