Frank P. SLATTERY, Jr., (on behalf of himself and on behalf of all other similarly situated shareholders of Meritor Savings Bank), Plaintiff–Cross Appellant,

and

Steven Roth, and Interstate Properties, Plaintiffs–Cross Appellants,

v.

UNITED STATES, Defendant–Appellant.

Nos. 2007–5063, 2007–5064, 2007–5089.

United States Court of Appeals, Federal Circuit.

Sept. 29, 2009.

---

Thomas M. Buchanan, Winston & Strawn, LLP, of Washington, DC, argued for plaintiff-cross appellant Frank P. Slattery, Jr., (on behalf of themselves and on behalf of all other similarly situated shareholders of Meritor Savings Bank). With him on the brief were Peter Kryn Dykema, and Eric W. Bloom.

Bradley P. Smith, Sullivan & Cromwell LLP, of New York, NY, argued for plaintiffs-cross appellants Steven Roth, and Interstate Properties. With him on the brief were Richard J. Urowsky and Jennifer L. Murray.

Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With her on the brief was Michael W. Hertz, Deputy Assistant Attorney General, Kenneth M. Dintzer, Assistant Director, F. Jefferson Hughes and William G. Kanellis, Trial Attorneys.

Dorothy Ashley Doherty, Federal Deposit Insurance Corporation, of Washington, DC, for amicus curiae Federal Deposit Insurance Corporation.

Before NEWMAN and GAJARSA, Circuit Judges, and WARD, District Judge.[*]

Opinion for the court filed by Circuit Judge NEWMAN. Dissenting opinion filed by Circuit Judge GAJARSA.

NEWMAN, Circuit Judge.

The United States Court of Federal Claims held that the United States, acting through the Federal Deposit Insurance Corporation ("FDIC"), breached a contract with the Meritor Savings Bank ("Meritor") and is liable in damages.[1] The government challenges the jurisdiction of the Court of Federal Claims to review contracts with the FDIC, and also appeals the ruling of breach of contract and the award and measure of damages. On cross-appeal the plaintiff shareholders (collectively "Slattery"), pursuing this action derivatively on behalf of Meritor and in the interest of its shareholders, challenge the sufficiency of the damages award. In addition, former shareholders Roth and Interstate Properties (collectively "Roth" or "Intervenors") challenge the dismissal of their claims in intervention. The FDIC filed a brief as *amicus curiae*, seeking to modify certain aspects of the judgment.

The decision of the Court of Federal Claims as to jurisdiction and liability for breach of contract is affirmed. With respect to damages, we affirm the award of lost value damages of $276 million, reverse the award of $67 million in non-overlapping restitution damages, and by agreement of the parties reverse as cumulative the award of wounded bank damages of $28 million. We affirm the denial of additional damages measured by the FDIC's savings of $696 million due to the merger that was implemented by the breached contract. We reverse the dismissal of the

---

[*] Honorable T. John Ward, United States District Court for the Eastern District of Texas, sitting by designation.

1. *Slattery v. United States*, 53 Fed.Cl. 258 (2002) (*"Liability Ruling"*); 69 Fed.Cl. 573 (2006) (*"Damages Ruling"*); 73 Fed.Cl. 527 (2006) (*"Dismissal of Intervenors' Complaint"*); 98 A.F.T.R.2d 2006–8303, 2006 WL 3930812 (Ct.Fed.Cl. Dec. 18, 2006) (*"Amended Final Order"*).

Intervenors' claims on jurisdictional grounds, and remand for consideration of any remaining aspects of the final disposition of this sixteen-year proceeding.

## BACKGROUND

Federal authority for regulation of state-chartered savings banks derives from the federal deposit insurance administered by the FDIC. In the late 1970s and early 1980s an economic recession accompanied by high interest rates placed extreme pressure on banking institutions, and the FDIC encouraged and assisted solvent banks to merge with failing banks, to avert bank failures and to avoid call on the FDIC insurance fund. Thus the FDIC sought to salvage a failing Pennsylvania bank, the Western Savings Fund Society ("Western"), through merger with a solidly solvent bank.

In April 1982 Meritor[2] and the FDIC agreed that Meritor would merge with Western, with various incentives and accounting expedients provided by the FDIC to enable the merged institution to comply with federal capital requirements despite Western's weak assets. The merger was implemented by several agreements. By a Merger Assistance Agreement ("the Assistance Agreement") the FDIC agreed to provide notes, cash, and other monetary assistance in exchange for Meritor's assumption of Western's obligations. By a Memorandum of Understanding ("the 1982 MOU") the FDIC and Meritor further agreed to the following accounting procedure:

Regarding the use by Bank of certain accounting methods, the FDIC would not object to the following:

. . . .

> 3. The difference between the liabilities assumed and the total of the market value of the Western assets, less reserves, may be treated as goodwill and amortized on a straight-line basis up to fifteen (15) years.

This accounting procedure treats "goodwill" as a form of capital. It is measured as the excess of the acquired bank's liabilities over the value of its assets and, as the Supreme Court explained in *United States v. Winstar*, 518 U.S. 839, 848–49, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), in effect treats liabilities as capital assets for regulatory compliance purposes.[3]

The Court of Federal Claims found, as undisputed fact, that the 1982 MOU authorizing this accounting procedure was critical to the merger with Western, for otherwise the merged bank would have immediately failed in capital compliance. The Pennsylvania Secretary of Banking, having regulatory oversight of Pennsylvania savings banks, agreed to this procedure. The Court of Federal Claims found that the cost to the FDIC's insurance fund would have been at least $696 million if Western had been liquidated, in contrast to the financial incentives the FDIC provided in connection with the merger with Meritor, which at that time were estimated at $294 million.

With the infusions of cash and with goodwill counted as regulatory capital pursuant to the 1982 MOU, the merged Meritor bank was in compliance with the feder-

---

**2.** Until 1986 Meritor was named the Philadelphia Savings Fund Society. For simplicity, the name "Meritor" is used throughout.

**3.** During the trial, William Isaac, Chairman of the FDIC at the time of the merger, testified that in 1980 he organized a task force that proposed merging failing savings banks with healthier ones and using goodwill accounting as a temporary expedient for achieving capital compliance until financial conditions improved.

al equity capital requirement for savings banks, which at that time was a minimum of 5% of adjusted total assets. *See FDIC Statement of Policy on Capital Adequacy,* 46 Fed.Reg. 62,693, 62,694 (Dec. 17, 1981) (establishing 5% capital requirement).[4] In 1983 Meritor converted to a stock savings bank pursuant to a public offering, and thereafter expanded its banking activities. By September 1984, Meritor's capital ratio was 6.49% including the goodwill, but only 0.49% was tangible capital. Although FDIC inspectors raised concerns about the role of goodwill capital as protection for the FDIC insurance fund, the FDIC assured Meritor that the 1982 MOU "remains unchanged and in place," and that Meritor could "continue to amortize the goodwill arising from the Western acquisition over the agreed upon period." *Liability Ruling,* 53 Fed.Cl. at 265 & n. 5 (quoting 1984 letter from FDIC to Meritor).

In 1985, as the nation's banking problems continued, the FDIC adopted new regulations raising the primary capital ratio for all FDIC-insured savings banks to a minimum of 5.5%. *See FDIC Capital Maintenance Rule,* 50 Fed.Reg. 11,128 (Mar. 19, 1985) (12 C.F.R. pt. 325).[5] However, the new regulations "grandfathered" the FDIC's previously approved recognition of intangible capital that included goodwill. Thus 12 C.F.R. § 325.5(b) (1985) provided that:

Any intangible asset which was booked in accordance with generally acceptable accounting principles when acquired and which was approved by the FDIC for inclusion in equity capital prior to the effective date of this regulation shall be counted in full as a component of primary capital and shall not be deducted from total assets if it is being amortized over a period not to exceed 15 years or its estimated useful life, whichever is shorter.

Nonetheless, in late 1985 the FDIC asked Meritor to enter into a new MOU and agree to increase its minimum capital requirement beyond the regulatory minimum of 5.5%. Evidence at trial showed the FDIC's concern that although goodwill accounting allowed Meritor to meet the regulatory capital requirement of 5.5%, protection of the FDIC insurance fund was not thereby assured, for goodwill was an inadequate substitute for hard capital. Meritor objected to the proposed increase, pointing out that the goodwill accounting method was authorized in the 1982 MOU and preserved in the grandfather clause of the 1985 regulations; the FDIC withdrew the request.

In 1987 and 1988 the FDIC again pressed Meritor to accept an increased capital requirement, for the pressures on banking institutions had not abated, and Meritor's situation was deteriorating. The FDIC requested that Meritor enter into a new Memorandum of Understanding ("the 1988 MOU") which would increase Meritor's minimum capital requirement to 6.5% of primary capital. The Court of Federal Claims found that Meritor then had no

4. The FDIC at the time defined "equity capital" to include "common stock, perpetual preferred stock, capital surplus, undivided profits, contingency reserves, other capital reserves, mandatory convertible instruments, and reserves for loan losses." 46 Fed.Reg. 62,694.

5. The regulation defines "primary capital" as "the sum of common stock, perpetual preferred stock, capital surplus, undivided prof-

its, capital reserves, mandatory convertible debt (to the extent of 20 percent of primary capital exclusive of such debt), minority interests in consolidated subsidiaries, net worth certificates issued pursuant to 12 U.S.C. 823(i) and the allowance for loan and lease losses and minus intangible assets other than mortgage servicing rights and assets classified loss." 12 C.F.R. § 325.2(h) (1985).

choice but to agree to the 1988 MOU, because Meritor was threatened with more extreme FDIC action if it refused. These events were the subject of extensive testimony at trial. For example, there was testimony concerning the FDIC's requirement that Meritor's Board of Directors appoint a new CEO of the FDIC's selection, following which the Meritor Board accepted the 1988 MOU. The 1988 MOU continued to allow Meritor to count goodwill as capital, but Meritor's new 6.5% capital requirement exceeded the existing regulatory minimum of 5.5% for savings banks.

The 1988 MOU also provided, inter alia, that if Meritor failed to achieve the 6.5% capital level by the end of 1988, Meritor must submit a capital plan to the FDIC that would increase its tangible capital by $200 million, and must present a five-year strategic plan to improve its financial health. At the end of 1988 the FDIC determined that Meritor had not met the 6.5% capital level and had not provided a satisfactory capital plan, although various other provisions of the 1988 MOU were met. Under pressure of an immediate Cease and Desist Order from the FDIC, Meritor proposed a capital plan that included selling many of its most valuable bank branches. The FDIC agreed and, pursuant to this plan, in 1989 Meritor sold 54 branch offices and matching assets to Mellon Bank, which paid a $331 million deposit premium. These proceeds enabled Meritor to meet the 1988 MOU's requirements.

However, the FDIC remained concerned about Meritor's viability even after the sale of the 54 branches, and in January 1990 the FDIC placed Meritor on a list of "projected bank failures." Discussions and negotiations about securing additional tangible capital continued, and in April 1991 the FDIC and Meritor signed a new agreement (the "1991 Written Agreement") that replaced the 1988 MOU. The 1991 Written Agreement raised Meritor's minimum capital requirement to a total ratio of 8.5% primary capital and 10.5% "risk-based capital." The 1991 Written Agreement continued to permit including goodwill in the capital calculation for each of these ratios.

On December 19, 1991 the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), Pub.L. No. 102–242, 105 Stat. 2236, became law. Section 131 of the FDICIA, titled "Prompt Corrective Action," set new standards for FDIC regulation of federally insured savings banks, requiring among other things that the FDIC establish a ratio of tangible capital to total assets below which a bank would be "critically undercapitalized," with that ratio to be no lower than 2%. *See id.* § 131(a) (codified at 12 U.S.C. § 1831*o*(c)(3)). On July 6, 1992, the FDIC announced a proposed rule implementing § 131 of the FDICIA, *Proposed Rule: Prompt Corrective Action,* 57 Fed.Reg. 29662. After a period for comment, the FDIC announced the final rule, *Final Rules: Prompt Corrective Action; Rules of Practice for Hearings,* 57 Fed.Reg. 44,-866, 44,897–44,903 (September 29, 1992), to take effect on December 19, 1992. The new rule interpreted the FDICIA as prohibiting the inclusion in regulatory capital of goodwill associated with acquisitions of failing institutions, regardless of any contrary prior agreement. *See* 12 C.F.R. § 325.2(s) (1993) (defining "tangible equity" to exclude "all intangible assets" except for certain purchased mortgage servicing rights); *see also* 12 C.F.R. app. A to pt. 325 (Statement of Policy on Risk–Based Capital).

The 1991 Written Agreement was entered with knowledge of the proposed FDICIA legislation, but before the FDIC

had adopted its new rule and established how goodwill capital would be treated under the new statute. After entering the 1991 Written Agreement, Meritor sought to sell additional assets in an effort to meet the heightened capital requirements, and made other efforts to retain bank and shareholder value. During the summer of 1992 the FDIC, in cooperation with the Pennsylvania Secretary of Banking, began taking steps to terminate Meritor's insurance, despite evidence that Meritor's total capital ratio at the time was 7.5% including goodwill. However, in September 1992 Meritor's tangible capital ratio, excluding goodwill, was only 0.66%. On October 1992 Meritor's Board of Directors authorized the FDIC to sell the bank on either an open or closed basis.

On November 1992 the FDIC prepared an internal memo in preparation for revoking Meritor's insurance, stating that the reason for its action was that the bank had been "unable to formulate an acceptable capital plan that does not involve FDIC assistance. Due to inadequate capital relative to the bank's risk exposure, continued operating losses, and the poor quality of assets, the bank is not considered a viable institution." *Liability Ruling*, 53 Fed.Cl. at 269 (quoting FDIC memo dated November 3, 1992). On December 9, 1992, the FDIC informed Meritor that when the new regulation took effect on December 19, 1992, Meritor would be "critically undercapitalized."

On December 11, 1992 the FDIC revoked Meritor's federal deposit insurance, which prompted the Pennsylvania Secretary of Banking to seize the bank on the same day. The FDIC was appointed receiver. The Court of Federal Claims cited a letter from the FDIC to Meritor, delivered on the day the FDIC revoked Meritor's insurance, which explained the FDIC's view that "the goodwill on the books of Meritor Savings Bank relating to the assisted acquisition of Western Savings Fund Society, Philadelphia, Pennsylvania, and any other intangible assets which do not meet the parameters enumerated in Section 325.2(s), will be excluded in measuring 'tangible equity.'" *Id.* at 286 (quoting letter from FDIC Director Stanley J. Poling to Meritor CEO Roger Hillas (Dec. 11, 1992)).

Slattery, as an owner of Meritor stock, filed suit in the Court of Federal Claims in 1993, stating that the FDIC breached the contract it had entered in 1982 in connection with Meritor's merger with the insolvent Western Savings Bank. Slattery styled the complaint both as a shareholder derivative suit and as a class action, reporting that the FDIC, as receiver for Meritor, had refused to act to enforce Meritor's contractual rights against the FDIC. The court ultimately dismissed the class action count, but accepted the shareholder derivative suit. *Slattery v. United States*, 35 Fed.Cl. 180, 183–84 (1996) ("*Motion to Dismiss Ruling*") (rejecting government's motion to dismiss and ruling that Slattery had standing to bring derivative claims); *Dismissal of Intervenors' Complaint*, 73 Fed.Cl. at 531 (dismissing Slattery's class action claims).

The trial as to liability consumed five months, from October 1999 through February 2000, with extensive testimonial and documentary evidence. After completion of the trial, but before the court's decision, the government moved to dismiss the case for lack of jurisdiction. The court denied the motion, *Liability Ruling*, 53 Fed.Cl. at 274, and the issue of jurisdiction is pressed by the government on this appeal. We start with this issue.

## I. JURISDICTION

The government moved for dismissal on the ground that the FDIC is a

non-appropriated funds instrumentality ("NAFI"), that is, an entity "which does not receive its monies by congressional appropriation." *United States v. Hopkins,* 427 U.S. 123, 125 n. 2, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976); *see also AINS, Inc. v. United States,* 365 F.3d 1333, 1337–39 (Fed.Cir.2004) (discussing history of the NAFI doctrine). With certain exceptions listed at 28 USC § 1491(a)(1),[6] NAFIs are not subject to the Tucker Act and thus are not within the jurisdiction of Court of Federal Claims. *See L'Enfant Plaza Properties, Inc. v. United States,* 229 Ct.Cl. 278, 668 F.2d 1211, 1212 (1982) ("Jurisdiction can only be exercised ... over cases in which appropriated funds can be obligated.").

The government states that since the FDIC is funded by insurance premiums paid by its member banks, and not by federal appropriation, any monetary claim against the FDIC is outside the jurisdiction of the Court of Federal Claims, for judgments in the Court of Federal Claims are paid from appropriated funds. *See* 28 U.S.C. § 2517(a) ("Except as provided by the Contract Disputes Act of 1978, every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefor, on presentation to the General Accounting Office of a certificate of the judgment by the clerk and chief judge of the court."); *Kyer v. United States,* 177 Ct.Cl. 747, 369 F.2d 714 (1966) (all judgments under the Tucker Act are paid from appropriated funds).

The Court of Federal Claims found no support for the proposed status of the FDIC as a NAFI, for neither its authoriz-

ing statute nor any judicial ruling negates the congressional intent, frequently reiterated, that the full faith and credit of the United States stands behind the FDIC's obligations. The Court of Federal Claims found that these expressions of congressional intent, rather than whether there are continuing federal appropriations, guide the inquiry into NAFI status. The court observed that Congress did appropriate start-up funds to the FDIC upon its creation in 1933, and pointed to the frequent congressional affirmations that federally insured deposits are backed by the full faith and credit of the United States, stating that "Congress has passed several resolutions which clearly articulate that Congress would appropriate funds in the future if the [insurance fund] ran out." *Liability Ruling,* 53 Fed.Cl. at 274. The court cited 12 U.S.C. § 1824(a), which authorizes the FDIC to borrow from the Treasury, up to $30 billion if needed, to meet FDIC obligations.

The government argues that it is irrelevant that the FDIC was provided with an initial appropriation in 1933, for it has since been self-supporting. The government states that the Federal Circuit confirmed in *Core Concepts of Florida, Inc. v. United States,* 327 F.3d 1331 (Fed.Cir. 2003), that an initial congressional appropriation to fund an entity established by the United States does not negate its NAFI status, because initial funding does not establish a continuing congressional obligation to fund the entity or meet its obligations. In *Core Concepts* the entity found to have NAFI status was the Federal Prison Industries ("FPI"), a "government-owned corporation that was created in 1934 to provide work simulation pro-

**6.** Section 1491(a)(1) states: "For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Ex-change Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States." That is, these entities are subject to Tucker Act jurisdiction.

grams and training opportunities for inmates of federal correctional facilities." *Id.* at 1333. The FPI received an initial congressional appropriation, then became self-supporting, repaid its initial funding, and has received no further appropriation. This court found the initial appropriation "of no consequence" because the enabling legislation showed that Congress intended that the FPI would be self-supporting. *Id.* at 1336. This court also referred to the separate accounting treatment of the FPI's funds as a "firm indication" that Congress intended to "absolve appropriated funds from liability for FPI's actions." *Id.* at 1337. Thus this court held that the FPI was a NAFI and could not be sued under the Tucker Act.

The government argues that *Core Concepts* is controlling precedent for the FDIC, in that Congress showed an intent that the FDIC would be independent of Treasury funds by requiring the FDIC's insurance funds to be "invested in obligations of the United States or in obligations guaranteed as to principal and interest by the United States," 12 U.S.C. § 1823(a)(1), and by requiring that FDIC funds be kept in separate depository accounts, rather than in the Treasury's general fund, *id.* § 1823(b). The government states that although by statute the FDIC may borrow from the Treasury, the FDIC must establish a repayment schedule, and that other restraints on FDIC obligations establish congressional intent to limit the FDIC's recourse to federal funds and thus exclude the FDIC from suit under the Tucker Act.

The government also draws analogy to *Furash & Co. v. United States*, 252 F.3d 1336 (Fed.Cir.2001), in which this court found that the Federal Housing Finance Board's expenses "are not expected to be defrayed by appropriated funds," and concluded that the Board is a NAFI. *Id.* at 1341. This court explained that "[t]he Court of Federal Claims must exercise jurisdiction absent a clear expression by Congress that it intended to separate the agency from general federal revenues," *id.* at 1339, and held that such a "clear expression" was present for the Federal Housing Finance Board in light of its enabling legislation, despite the absence of any "express[ ] prohibition of congressional appropriation of funds," because the statute provided for complete funding through assessments against federal home loan banks, including a mechanism for using assessments to make up deficiencies, and provided for the separation of the Board's funds from the general fund of the Treasury. *Id.* at 1340.

In contrast, in *L'Enfant Plaza Properties* the Court of Claims held that that the Office of the Comptroller of the Currency is not a NAFI, finding no "clear expression" of congressional intent to wall the Comptroller off from appropriated funds. The court observed that "Congress is not statutorily prohibited from appropriating funds to the Comptroller if a deficiency should occur," 668 F.2d at 1212, and remarked that the Comptroller had in fact received such appropriations through 1947, *id.* Thus the Court of Claims held that the Comptroller is subject to suit under the Tucker Act.

While these cases differ on their facts, precedent consistently illustrates that an entity doing the work of the government will be deemed a NAFI only where there is a "clear expression" that Congress intended to exclude the entity from access to appropriated funds. *See L'Enfant Plaza Properties*, 668 F.2d at 1212 ("Jurisdiction under the Tucker Act must be exercised absent a firm indication by Congress that it intended to absolve the appropriated funds of the United States from liability for acts of the Comptroller.").

This aspect is included in the four-part test for NAFI status that this court summarized in *AINS, supra; viz.*, that a government instrumentality is a NAFI only if: "(1) It does not receive its monies by congressional appropriation; (2) It derives its funding primarily from [its] own activities, services, and product sales; (3) Absent a statutory amendment, there is no situation in which appropriated funds could be used to fund the entity; and (4) There is a clear expression by Congress that the agency was to be separated from general federal revenues." 365 F.3d at 1342 (internal quotation marks and citations omitted). The *AINS* court applied this test to hold that the United States Mint is a NAFI, for the Mint is self-supporting through sales of products. This court found that the Mint's enabling statute "demonstrates a clear congressional intent to segregate the Mint's funds from the general fund." *Id.* at 1344.

The government argues that the four factors in *AINS* are met as to the FDIC, stating that "Congress has consistently shielded appropriated funds from all FDIC functions before 1989, and since then from the FDIC's activity as insurer of state-chartered savings banks." Gov't Br. 35. Slattery disagrees, arguing that the Court of Federal Claims correctly held that the determinative factor is not whether the FDIC's insurance fund has been adequate to meet its obligations, but whether the Congress intended that the United States cannot be called upon if needed to meet the obligations of the FDIC.

The Court of Federal Claims, examining congressional intent, found many expressions that Congress intended to back the FDIC with the full faith and credit of the United States. For example, Senate Concurrent Resolution 72, 97th Cong., 128 Cong. Rec. 1530 (Mar. 17, 1982), which was adopted in the period of economic recession that gave rise to this case, provided:

Resolved by the Senate (the House of Representatives concurring), That the Congress reaffirms that deposits, up to the statutorily prescribed amount, in federally insured depository institutions are backed by the Full Faith and Credit of the United States.

Another example is the Competitive Equality Banking Act of 1987, Pub.L. No. 100–86, § 901, 101 Stat. 552:

SEC. 901. REAFFIRMATION OF SECURITY OF FUNDS DEPOSITED IN FEDERALLY INSURED DEPOSITORY INSTITUTIONS.

(a) FINDINGS.—The Congress finds and declares that—

(1) since the 1930's, the American people have relied upon Federal deposit insurance to ensure the safety and security of their funds in federally insured depository institutions; and

(2) the safety and security of such funds is an essential element of the American financial system.

(b) SENSE OF CONGRESS.—In view of the findings and declarations contained in subsection (a), it is the sense of the Congress that it should reaffirm that deposits up to the statutorily prescribed amount in federally insured depository institutions are backed by the full faith and credit of the United States.

The Court of Federal Claims also observed that the 1991 FDICIA legislation which tightened savings bank capitalization recognized that the government is liable for possible shortfalls in the FDIC insurance fund. *See* H. Rep. No. 102–293, at 33 (1991) ("The primary purposes of the Federal Deposit Insurance Corporation Improvement Act of 1991 are to provide additional resources to the [insurance fund]...."). The FDICIA increased the amount the FDIC may borrow from the

Treasury to $30 billion, *see* FDICIA, Pub.L. No. 102–242, § 101, 105 Stat. 2236, and, as the Court of Federal Claims observed, the House Conference Report summarizing that legislation stated that "[i]f the industry cannot fulfill the promise of deposit insurance to reimburse depositors in case of failure, the government and taxpayers will have to honor this commitment instead." H.R.Rep. No. 102–330, at 95 (1991) (Conf.Rep.). This Report also stated that taxpayers had already bailed out the analogous insurance fund for savings and loan institutions at a cost of $500 billion. *Id.* This and other acts of Congress to provide appropriated funds to other federal regulators of financial institutions are strong indication that Congress had no intention of allowing federally insured deposits to be unprotected. *See, e.g.,* 12 U.S.C. § 1821a(c)(1) (provision enacted with the FIRREA legislation requiring the Treasury to pay remaining liabilities of the FSLIC Resolution Fund).

Further, as this appeal was proceeding, the FDIC announced its final rule in the *Temporary Liquidity Guarantee Program,* 73 Fed.Reg. 72244 (Nov. 26, 2008), in response to the current crisis in the nation's banking sector. The FDIC stated that the FDIC program "is subject to the full faith and credit of the United States pursuant to section 15(d) of the FDI Act, 12 U.S.C. § 1825(d)." 73 Fed.Reg. at 72252; *see also* 12 C.F.R. § 370.5(h)(2) (codification of final rule). After Slattery brought this action to the court's attention, the government responded by post-argument letter dated January 16, 2009, stating that "[t]he FDIC's representation is, however, far different than a congressional appropriation of funds or a congressional guarantee that funds will be appropriated.... [N]otwithstanding the backing of the full faith and credit of the United States for the FDIC's activities, Congress has *not* agreed to pay any amount guaranteed by the FDIC, and has neither authorized nor appropriated funds to satisfy any such guarantee." (Emphasis in original). The government points to the various caveats and safeguards and limitations in the cited final rule, and the absence of any reference to appropriated funds. *Id.*

Thus the government argues that these various resolutions and promises cannot be relied upon, and that assurances of the full faith and credit of the United States do not assure congressional fulfillment of the FDIC obligations. The government maintains that the lack of explicit provision of appropriated funds, and the segregation of the FDIC's insurance fund from the general fund of the Treasury for accounting purposes, provide sufficient evidence that Congress intended to exclude the FDIC from access to appropriated funds.

The Court of Federal Claims did not accept the government's position, reasoning that the government had failed to show clear congressional intent that the FDIC was to be barred from access to appropriated funds. The question of congressional intent with respect to the FDIC was not present in the cases on which the government primarily relies, including *Furash* (for the Federal Housing Finance Board), and *Core Concepts,* (for the Federal Prison Industries).

The FDIC was formed in 1933 to provide government insurance and thus reassurance to bank depositors at a time of national emergency, and its funding was established initially by appropriation and thereafter by premiums paid by member banks, with authority for the FDIC to borrow from the Treasury. No provision of the enacting legislation bars the FDIC from access to appropriated funds. The Court of Federal Claims correctly held that this funding structure did not negate the government's strong commitment to

the nation's banking system and protection of depositors, implemented through the FDIC.

In the context in which the FDIC was formed, and the continuing governmental affirmations of monetary support, the only reasonable interpretation is that the legislative intent was to assure payment of the FDIC's obligations. The Court of Federal Claims correctly ruled that the FDIC does not meet the fourth factor of the *AINS* test, and that the FDIC is not a NAFI. We affirm the ruling of the Court of Federal Claims that contract claims against the FDIC are subject to suit under the Tucker Act. The denial of the government's motion to dismiss for lack of jurisdiction is affirmed.

## II. LIABILITY

The trial on the issue of liability consumed five months, with many witnesses and extensive documentary evidence. In a full and detailed opinion, the Court of Federal Claims ruled that the 1982 MOU was part of a legally binding agreement between Meritor and the FDIC, that the provision allowing supervisory goodwill from the Western merger to be treated as capital for regulatory purposes was an enforceable term of that agreement, and that the FDIC had breached the agreement on three separate occasions: first in imposing the 1988 MOU which raised Meritor's minimum capital requirement to 6.5%; again in raising the capital requirement to 8.5% pursuant to the 1991 Written Agreement; and again in 1992 when it revoked Meritor's federal deposit insurance and forced seizure of the bank. The factual and legal premises are set forth in the trial court's opinion, *see Liability Ruling*, 53 Fed.Cl. 258, and will be repeated only as needed to explain our affirmance of the court's ruling that the FDIC breached its contract with Meritor.

The basic contract found to be breached is the 1982 MOU, which permitted Meritor to rely on supervisory goodwill for regulatory capital purposes. The Court of Federal Claims noted the "voluminous testimony," which established "a clear record of the intent of the parties," with respect to this accounting procedure. *Id.* at 275. Witnesses for both sides explained that the purpose of the goodwill accounting procedure, as set forth in the 1982 MOU, was to enable Meritor to meet the statutory and regulatory capital requirements for savings banks, thereby providing time for the merged entity to absorb the deficits that had pushed Western into insolvency. Four of the key negotiators of the 1982 merger so testified at the trial: William Isaac, chairman of the FDIC at the time of the merger; Robert Gough, Deputy Director of the FDIC Division of Bank Supervision; Anthony Norcella, Executive Vice President for Finance at Meritor; and Robert S. Ryan of Brinker, Biddle & Reath, outside counsel to Meritor. All acknowledged that the merger would not have been feasible without this authorization to treat goodwill as regulatory capital. The government does not dispute that but for the goodwill accounting procedures the merged bank would have been in immediate noncompliance, and that the merger could not have been approved. The Court of Federal Claims also discussed the situation confronted by the FDIC at that time, with the possible failure of hundreds of banks on the horizon. *Id.* at 276. FDIC witnesses testified that the merger served to reduce the threat of an immediate large draw on the insurance fund. *See id.* at 263, 276. On this evidence, the trial court found that the goodwill accounting was the "key FDIC concession." *Id.* at 263.

The Court of Federal Claims found that the FDIC first breached the 1982 contract in 1988 when it effectively ignored Meri-

tor's right to rely on goodwill as capital, deemed the bank to be in a dangerous position with respect to capital reserves, and required it to enter into the 1988 MOU which raised its total capital requirements. The court entered extensive findings, based on trial testimony and documentary evidence, relating to the FDIC's increasing unwillingness to recognize goodwill capital as "real capital" for regulatory purposes. *Id.* at 283 ("The court finds that the FDIC would not have imposed the 1988 MOU on Meritor if the FDIC had treated the Western goodwill as real capital as required by the 1982 MOU."); *see also id.* at 264–65 (quoting testimony and record statements from FDIC employees casting doubt on the Meritor goodwill as regulatory capital); J.A. 300076 (1987 memorandum from FDIC Examiner Valinote recommending regulatory action and describing Meritor's goodwill as "fictitious capital"). The court found that Meritor entered the 1988 MOU under duress. *See* 53 Fed.Cl. at 266 ("From the uncontradicted testimony it was clear Meritor had no choice in signing the MOU in 1988.").

The Court of Federal Claims found that the 1988 MOU led directly to the downward spiral of the Meritor bank, based on the forced sale of the bank's most productive assets in response to the FDIC's pressures for increased capital. The court referred to Meritor's *attempts to comply* with the FDIC's capital requirements beyond those of statute and regulation, under threat of seizure, including the bank's shrinking of its assets from $19 billion to $5.9 billion in less than five years. The court found:

> [A]bsent the increased capital levels in the 1988 MOU, Meritor would not have sold the 54 branches as it did. Further, the court finds that the sale of those branches [led] to the rapid decline in Meritor's capital ratios because the remaining assets earned less income and were riskier than those Meritor had sold.

*Id.* at 283. The court found that the forced sale of the 54 branches effectively "doomed the bank," *id.* at 283, and led to the 1991 Written Agreement, which in turn caused a "downward death spiral for Meritor," *id.* at 285.

Central to the Court of Federal Claims' ruling was its finding that Meritor was entitled to rely on the FDIC's promises made in inducement for the merger, as set forth in the 1982 MOU, and that the FDIC was bound by this contract to respect this structure and not to circumvent it by raising the total capital ratio, even when the merged bank was in compliance with the regulatory limits. Although the government states that in 1989 Meritor fell below the total capital requirement of the 1988 MOU, and slightly below the prevailing 5.5% limit then set by regulation, even including its goodwill, the Court of Federal Claims determined that Meritor had been so significantly weakened by the FDIC's demands, that its deterioration and destruction naturally followed.

It is undisputed that the FDIC subjected Meritor to heightening capital requirements. However, the government argues that the FDIC never actually prevented Meritor from counting goodwill as capital, noting that both the 1988 MOU and the 1991 Written Agreement expressly allowed Meritor's goodwill capital to continue to be counted against the regulatory minima they imposed. The government argues that the FDIC simply exercised its "safety and soundness" powers to raise Meritor's total capital requirements in 1988 and 1991. The government states that Meritor had grown too rapidly in the mid–1980s and had taken on additional risky assets that sustained heavy losses, placing the bank at risk for failure, and that the FDIC

evaluates the quality of different kinds of bank assets in evaluating financial strength and determining need for regulatory intervention. The government points to evidence that at the time of the 1988 MOU, Meritor's regulatory capital (apart from goodwill) was about to shrink by $252 million due to the maturity of certain capital notes relating to the Western merger; that Meritor's CEO, Fred Hammer, wrote to shareholders at the end of 1987 about the bank's inability "to achieve sustained operating earnings under its existing structure" and "weaknesses in our financial infrastructure," J.A. 400523, and that at the time of the 1988 MOU the FDIC's overall rating for Meritor was "4" on a scale from 1–5, with 5 being the worst. The government states that this evidence shows that the FDIC had sufficient cause to take regulatory action to require Meritor to secure more tangible capital, for in the first half of 1989 Meritor's regulatory capital fell to 5.15%—below even the 5.5% minimum required by regulation—as confirmation of the FDIC's concerns. The government does not dispute the existence of a contract, or that the provision relating to goodwill was an enforceable term. However, the government contends that the Court of Federal Claims erred by failing to recognize the FDIC's responsibility to ensure the safety and soundness of all savings banks, and that this responsibility required the FDIC to increase Meritor's capital requirement, despite its contractual agreement to recognize goodwill as capital.

The government also states that while Meritor may have felt pressure from the FDIC to enter the 1988 MOU, it nonetheless did so voluntarily to avoid enforcement proceedings, including seizure, that the FDIC would have validly pursued under its statutory authority, 12 U.S.C. § 1818(b). Had Meritor instead allowed enforcement proceedings to go forward, the government points out, it could have challenged the action through the administrative procedure provided by 12 U.S.C. § 1818(h), which includes judicial review. Meritor did not take this step, instead agreeing to the new capital requirements (albeit after the FDIC had inserted its choice of CEO to manage the bank).

The government thus argues that the Court of Federal Claims did not fully understand the FDIC's regulatory authority, for even if the FDIC were bound by the 1982 contract to recognize goodwill as capital for accounting purposes, that asset, like all bank capital, was subject to continuing evaluation based on its quality and characteristics. The government states that goodwill capital was properly treated by the FDIC as an "amortizing, non-earning asset," and that Meritor's overall poor rating justified the imposition of higher total capital levels despite the agreement at the time of the merger and despite Meritor's technical compliance with existing regulatory capital requirements. The government contends that the evidence that various FDIC officials regarded goodwill capital as "fictitious" was insufficient to establish that the FDIC's actions breached its contract, citing this court's own reference to goodwill capital (in the savings and loan context) as "fictitious assets" and an "accounting fiction," in *Granite Management Corp. v. United States*, 511 F.3d 1360, 1363–64 (Fed.Cir.2008). Thus the government argues that nothing in the 1982 MOU barred the FDIC from increasing Meritor's capital requirements if its financial condition declined, and that these aspects of the banking system's safety and soundness policies were not understood by the Court of Federal Claims.

This issue was fully explored at trial, with witnesses on both sides of the question. The Court of Federal Claims rejected the government's argument that the FDIC's regulatory actions were in keeping

with its contractual obligations to Meritor, finding the reason the FDIC raised Meritor's capital requirements in 1988 and again in 1991 was that the FDIC was no longer willing to treat goodwill as capital, despite its 1982 agreement to do so. The court heard the testimony of FDIC witnesses who were persistently critical of the goodwill accounting method, calling it "fluff" and "fictitious capital" and "worthless." In contrast, as the court pointed out, the intent of the 1982 MOU was to accept this expedient and recognize the Western goodwill as capital that would be applied toward the regulatory capital obligations, for all involved understood that otherwise Meritor would not have taken on the liabilities of the failing Western bank. Although on appeal the government stresses its side of the issue, on the entirety of the evidence the government has not shown clear error in the court's findings, supported by abundant documentary and testimonial evidence, that the FDIC's actions to increase Meritor's total capital requirements were based on the FDIC's adverse view of goodwill capital, and that these actions were contrary to the intent and purpose of the 1982 MOU.

Nor are we persuaded that the trial court failed to understand the nature of the FDIC's regulatory authority in the context of this case. There was extensive testimony, by witnesses from both sides, showing that both sides had the same understanding of the accounting role and the purpose of supervisory goodwill, as essential to meet the regulatory capital requirements due to the poor quality and high risk of the assets acquired from Western. The evidence showed that all concerned understood the heavy burden of Meritor's absorption of Western's losses, and that both sides understood the need for long-term forbearance to enable the merger, for, as the Court of Federal Claims stated, otherwise "Meritor would have been oper-

ating in an unsound condition the moment it signed the merger documents." *Liability Ruling*, 53 Fed.Cl. at 275. The court stressed the inducement offered by the FDIC to encourage Meritor to take on the liabilities of Western. At the same time, the court acknowledged the FDIC's continuing regulatory powers, as exemplified by its 1985 increase in the minimum capital requirement, whose propriety has not been challenged. The issue before the court was not whether the FDIC had authority to raise Meritor's primary capital requirement above the minimum regulatory figure; the question was whether, in so doing in the circumstances of this case, the FDIC breached the agreement it made in 1982 to induce Meritor to salvage the Western bank's insolvency.

Viewing the circumstances at the time of contracting, *see Winstar*, 518 U.S. at 868–69, 116 S.Ct. 2432, the government's obligation to recognize supervisory goodwill to meet capital regulatory requirements included the obligation not to subvert that expectation by increases in "hard" capital requirements. The Court of Federal Claims interpreted the 1982 MOU in accordance with its clearly stated terms that supervisory goodwill could be accounted as capital and would be available to meet the regulatory capital requirements. The trial court's interpretation of the contractual terms and purpose, and its findings of breach by subsequent FDIC actions, are supported by the evidence. Reversible error has not been shown in these findings and conclusions. The FDIC's responsibility for the "safety and soundness" of the banks it regulates does not insulate it from the consequences of breach of contract.

We affirm the ruling that the FDIC breached the 1982 MOU when it required and continued to require Meritor to in-

crease its primary capital. Clear error has not been shown in the court's findings that the FDIC imposed the 1988 MOU because it failed to treat goodwill as real capital, and that the heightened capital requirements led to the "downward spiral" beginning with the forced sale of 54 branch offices. Nor has error been shown in the court's findings that the FDIC again breached the 1982 MOU when it imposed the 1991 Written Agreement with its increased capital requirements, and again when it caused the bank's seizure in 1992, upon enactment of the FDICIA and the planned elimination of all right to rely on goodwill for regulatory capital.[7]

## III. DAMAGES

The court held a further trial to determine damages, receiving expert testimony and other evidence from both sides relating to several different damages theories. The court awarded damages in the total amount of $371,733,059. On motion for clarification, the court explained that the damages were to be paid net of any receivership claims and outside the statutory distribution scheme for proceeds held by the FDIC as receiver as provided by 12 U.S.C. § 1821(d)(11), and that any federal corporate income tax liability that might be imposed on the damages award would be grossed-up. *Damages Ruling,* 69 Fed. Cl. at 587; *Dismissal of Intervenors' Complaint,* 73 Fed.Cl. at 531; *Amended Final Order,* 98 A.F.T.R.2d 2006–8303, 2006 WL 3930812. The government appeals several

aspects of the damages award. Slattery, by cross-appeal, argues that the trial court should have accepted its alternative damages theory based on the FDIC's avoided liquidation costs of $696 million. We discuss the various aspects of the damages ruling in turn, applying the standard of review developed for *Winstar* cases. *See, e.g., Fifth Third Bank v. United States,* 518 F.3d 1368, 1375 (Fed.Cir.2008) ("In the *Winstar* context, foreseeability, causation, and proof of damages to a reasonable certainty are all issues of fact that we review for clear error.").

### A. Lost Value Damages

Among the several damages theories presented at trial, the Court of Federal Claims awarded "lost value" damages of $276 million based on Meritor's market valuation on August 1, 1988, immediately before the government's first breach, on the theory that all of this value was lost by the chain of consequences initiated by the FDIC's first breach. All parties agree that the shareholder value after seizure was zero. In reaching the $276 million, Slattery's damages expert, Dr. Finnerty, calculated the actual stock market valuation of the bank on August 1, 1988 to be $171 million. He also calculated an "adjusted market capitalization" to correct the negative effect of publicity on the pending regulatory action against Meritor, totaling $196 million. He then applied a 50% control premium to each amount, yielding $256 million and $296 million, and averaged these two numbers to arrive at $276

---

**7.** This case exhibits similarities to the *Winstar* line of cases involving savings and loan institutions in that each involves a contract requiring accounting treatment of "goodwill" as capital. In *Winstar* the breaching event was enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, which did not recognize goodwill capital. The Court held that "[w]hen the law as to

capital requirements changed in the present instance, the Government was unable to perform its promise and, therefore, became liable for breach." 518 U.S. at 870, 116 S.Ct. 2432. For savings banks, the 1991 enactment of the FDICIA was followed by an FDIC regulation that barred reliance on goodwill as capital. Meritor was seized ten days before the effective date of that regulation.

million. This was the amount adopted by the trial court.

 The court referred to this award as a form of "expectancy damages." The basic principle of expectancy damages for breach of contract is to place the non-breaching party in as good a position as it would have occupied had the contract been performed. *See Restatement (Second) of Contracts* §§ 344(a), 347. As stated in *Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 496 (2d Cir.1995), "when the breach of contract results in the complete destruction of a business enterprise and the business is susceptible to valuation methods, such an approach provides the best method of calculating damages."

The government has not challenged the viability of this basic theory of damages based on lost value. However, the government does dispute when and how to determine the lost value that was causally related to the FDIC's breach. The government argues that the trial court erred in selecting August 1, 1988 as the date from which to measure Meritor's loss in value, stating that the bank's Board of Directors, and therefore its shareholders, continued to control its operations after the FDIC's first breach in 1988 and continuously until December 11, 1992 when the bank was seized. The government argues that it cannot be assumed that all of the losses in bank value over that four-year period were due to the breach that occurred in 1988. The government cites the testimony of Slattery's expert, Dr. Goldstein, who stated that even without the FDIC's breach Meritor would have had to shrink during the period from 1987–1992 by at least $10 billion in assets in order to satisfy the prevailing 5.5% capital requirements, with hypothetical losses of $650.9 million for the years 1988–1991. This testimony was cited by the trial court in explaining its decision not to award reliance/cost-of-performance damages under Slattery's alternative damages theory. *See Damages Ruling,* 69 Fed.Cl. at 577–78.

The government argues that these hypothetical losses after 1988 should be set off against the actual market value in 1988, reducing the damages award to zero. The Court of Federal Claims deemed this argument "unpersuasive," finding that the series of events whereby the bank was seized would not have occurred at all, but for the 1988 breach and the ensuing FDIC actions and pressures based on the FDIC's distaste for goodwill capital. The court observed that while Dr. Goldstein's model predicted losses, his model also predicted an ultimate return to profitability—a goal that was never realized because of FDIC's breaches that led to seizure of the bank. Hence, after considering testimony by Slattery's damages experts about the hypothetical "non-breach" world and other evidence, the court found it unlikely that Meritor would have failed in the relevant time period had the FDIC not breached the contract it entered in 1982. The government has not shown clear error in these findings.

The government also argues that, at a minimum, the damages must be offset by any benefits the shareholders realized from the bank's operations during the period after the 1988 breach, citing *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1366 (Fed.Cir.2003) ("damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach"). We agree with the proposition, but observe that it is qualified by the next sentence in *LaSalle,* which states, "However, the mitigation is limited to actions reasonably directly related to the breach and its proximate consequences." *Id.* The trial court found that the breach was the "but for" cause of the

seizure, and that Meritor's actions after the 1988 MOU were heavily directed to attempts to comply with the FDIC's new capital requirements. The court did not accept the theory that the damages for breach should be offset by whatever gain or loss in value might have occurred due to subsequent economic conditions, both for lack of proof, and because the court determined that but for the breach upon imposition of the new 1988 capital requirements, the bank would have survived. These findings, and their application to the damages award, have not been shown to be clearly erroneous.

We discern no error in the court's determination that the government did not establish any offsetting benefits, and in any event Slattery correctly observes that any benefits that may have accrued were subsequently appropriated by the government when it seized the bank and liquidated its remaining assets, for the parties state that none of the liquidation proceeds, reported to be $181 million, has been returned to the shareholders. The lost value measure of damages is affirmed.

## B. Control Premium

■ The court received expert testimony from both sides on the question of a "control premium" in valuation of the entire bank as a unit. The trial court found that a 50% premium was needed to accurately account for the value of control on August 1, 1988, the date from which the lost value award was calculated. Slattery's expert Dr. Finnerty testified that a control premium is not included in the bank's normal stock market capitalization, and that acquirers of a majority interest of the entire corporation are generally willing to pay a premium for control of the enterprise. The government argues that a control premium is only relevant in an acquisition context, not in a suit for breach of contract resulting in a bank's demise. The government contends that a control premium represents additional value to a shareholder who acquires enough shares to control the bank, rather than an inherent aspect of the bank's market value, and that because this is a derivative action on behalf of the bank itself, shareholder value based on control is irrelevant.

The government cites tax cases, such as *Philip Morris, Inc. v. Commissioner*, 96 T.C. 606, 1991 WL 51559 (1991), *aff'd*, 970 F.2d 897 (2d Cir.1992), where the Tax Court held that the purchase premium paid for control was distinct from the value of the acquired business. *Id.* at 632. The government also argues that even when a control premium might be appropriate, the courts will look to the particular facts of the acquisition, citing *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 231, 1990 WL 17251 (1990) ("The focus of a valuation inquiry . . . is on the existing facts, circumstances, and factors at the valuation date that influence a hypothetical willing buyer and willing seller in determining a selling price."), and *Estate of Andrews v. Commissioner*, 79 T.C. 938, 940–41, 1982 WL 11197 (1982) ("Fair market value has long been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."). Because Slattery did not present evidence of a willing buyer at the valuation date applied by the Court of Federal Claims, the government argues that the court clearly erred in applying a control premium to the valuation.

Slattery cites *Indu Craft*, 47 F.3d at 496, where the Second Circuit held that total franchise value is the best measure of damages "when the breach of contract results in the complete destruction of a business enterprise and the business is

susceptible to valuation methods." The government points out that instead of applying a multiplier to market value in *Indu Craft*, the court applied a multiplier to the business' earnings to determine its franchise value. Slattery responds that any reasonable measure of total franchise value suffices, and that clear error has not been shown in the measure selected by the court.

Slattery also cites *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1053 (5th Cir.1981), in support of the total franchise value theory, while the government points out that the jury's award of damages was based on an alternative lost profits theory. Slattery also refers to the Fourth Circuit's statement that a discount or premium for control can be appropriate in determining fair market value, in *Estate of Godley v. Commissioner*, 286 F.3d 210, 214 (4th Cir.2002), in the context of valuing for estate tax purposes a closely held corporation that "has no ready market for its shares," the court acknowledging that for publicly traded companies "[t]he fair market value of a business interest can often be determined simply by examining its market price," *id.*

The authorities cited by both sides provide general valuation guidance, but are not sufficiently on point to provide controlling reasoning with respect to the facts of this case. The trial court's application of a control premium to determine Meritor's fair market value was a fact determination based on extensive and detailed expert testimony and lawyer argument. Slattery's expert, Dr. Finnerty, provided testimony in support of this theory, and the trial court deemed his analysis persuasive. The evidence supported Dr. Finnerty's contention that even an underperforming bank, if it has strong franchise value based on depositor loyalty, such as Meritor, commands a high control premium. The government's damages expert criticized Dr. Finnerty's analysis, and presented an alternative analysis that the Court of Federal Claims found less persuasive.

■ We have not been shown clear error in the court's resolution of competing expert testimony to rule that lost value is reasonably measured by the value of the entire franchise including a control premium. Nor has clear error been shown in the court's findings concerning the amount of the premium, for it was supported by evidence of control premiums that have been paid for weakly performing entities. The award of $276 million for lost value, including the control premium, is affirmed.

### C. Non–Overlapping Restitution

■ The Court of Federal Claims rejected Slattery's alternative theory of damages measured by "restitution" of the benefit conferred on the government in 1982 by the Meritor merger and the resultant avoidance of immediate liquidation of Western. However, the court awarded an additional $67,340,000 as damages based on "non-overlapping restitution." This sum represented the "net costs" incurred by Meritor in entering into the merger, calculated as the difference between the total costs Meritor incurred upon entering into the merger, and the cash value of the benefits conferred on Meritor by the FDIC in connection with the merger. The court held that "[t]his amount, along with the value of the bank that the breach destroyed, put the bank in a position it could reasonably expect if the contract had been performed and not breached." *Damages Ruling*, 69 Fed.Cl. at 587.

The government argues that the court committed legal error in augmenting its lost value "expectancy" damages award by this amount, stating that it is incorrect to view these net costs as "non-overlapping." The government argues that restitution

and expectancy damages are alternative damages theories, and are incompatible, because restitution is designed to unwind the bargain and restore the breaching party to its position before the contract was entered, while expectancy damages are designed to give the non-breaching party the benefit it would have received had the contract been performed without breach. *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001); *see also Restatement (Second) of Contracts* § 344(a) (expectation interest), § 344(c) (restitution interest).

The government argues that the court's statement that its addition of a restitution remedy would "put the bank in a position it could reasonably expect if the contract had been performed and not breached" is incorrect, for if the contract had been performed the bank would not have received reimbursement of the net costs it incurred at the time of entering the merger. The government contends that it is improper both to "unwind" the contract by returning Meritor to its pre-contract status while also affording Meritor the expected benefits of the contract by awarding lost value damages; and that the result is duplicative payment of damages and a "windfall to the non-breaching party," quoting *American Capital Corp. v. United States*, 472 F.3d 859, 870 (Fed.Cir.2006).

In response, Slattery acknowledges some inconsistency in the trial court's description of the damages awards, but argues that the problem is one of semantics rather than logic, stating that the awards do not overlap and are independently supported. Slattery describes the "lost value" damages award as "the essence of restitution," arguing that it is intended to "restor[e] to the non-breaching party the net loss that [it] suffered as a result of [its] performance under the contract," *Landmark Land Co. v. FDIC*, 256 F.3d 1365,

1372 (Fed.Cir.2001). Slattery also describes the award as "reliance-type restitution damages," arguing that the guiding principle is that "a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise," *Glendale*, 239 F.3d at 1382. Slattery contends that Meritor's net payments on entering the contract in 1982, and its loss of the 1988 value of the bank, are distinct measures, and are both proper components of a unitary "reliance-type restitution" award.

We conclude that the government is correct, and that the trial court erred in awarding both the net cost of entering the contract, and the value lost due to the breach. While the two sums are measured by different transactions that do not technically "overlap," they are incompatible as measures of damages for breach. This is not merely a matter of nomenclature, for even on Slattery's position that the "lost value" award is more accurately described as reliance damages, the awards are economically incompatible. *See American Capital*, 472 F.3d at 870 ("[R]estitution is not recoverable in addition to reliance damages for the same injury."). Upon entering the contract, the costs of entry, at least for contracts that are performed for a reasonable period prior to breach, are subsumed in the value when the contract is breached.

This addition of $67 million in restitution is incompatible with the lost value award, and is reversed.

### D. "Wounded Bank" Damages

The Court of Federal Claims also awarded Slattery $28,393,059 in "wounded bank" damages, measured by the costs that Meritor incurred in trying to sell major assets in its effort to comply with the breaching increases in its capital require-

ments. The parties agree that if the lost value damages award is sustained, the wounded bank damages are duplicative. Because we have affirmed the lost value award, the $28 million in wounded bank damages is reversed.

### E. Cross–Appeal on Restitution

Slattery states by cross-appeal that the Court of Federal Claims improperly denied the alternative request for restitution damages measured by the financial benefits realized when the FDIC induced Meritor to merge with Western and thereby avoided liquidating Western at a cost that the FDIC estimated at $696 million. A restitution award focuses on "taking from the breaching party any benefits he received from the contract and returning them to the non-breaching party." *Glendale*, 239 F.3d at 1380–81 (citing *Restatement* § 344(c)); *see also* 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.19 (2d ed. 1998) ("The objective is not to put the injured party in as good a position as that party would have been in if the contract had been performed, nor even to put the injured party back in the position that party would have been in if the contract had not been made. It is, rather, to put the party in breach back in the position that party would have been in if the contract had not been made."). The Court of Federal Claims denied the request for lack of support in this court's *Winstar*-related precedents, stating that the parties could brief and argue the matter before this court, as they have done. We have considered the matter, and affirm the denial.

The Court of Federal Claims found that Slattery had established a factual predicate for the restitution claim, stating that "there does seem to be adequate support, by a preponderance of the evidence, that, but for Meritor's acquisition, the Government (here the [FDIC's insurance fund])

would have had to pay out $696 million." *Damages Ruling*, 69 Fed.Cl. at 586. Subtracting the cost of the merger to the government of $294 million (as estimated contemporaneously with the merger), the court found that "[t]he assumption of Western's liabilities by Meritor clearly produced this $402 million saving." *Id.* The court observed that the award of such restitution is supported by traditional contract damages theory, but found inadequate support for such an award in the *Winstar* line of precedents, stating that "the Federal Circuit has rejected some in-kind benefits provided to the Government, and affirmed restitution of only direct monetary payments by the plaintiffs as part of contractual performance." *Id.*

Slattery contends that the Court of Federal Claims erred in denying restitution, in that the facts of this case are fundamentally distinguishable from those cases in which this court has denied restitution in the *Winstar* context. In particular, Slattery points out that there was strong evidence that immediate liquidation of Western was the only avenue open to the FDIC had Meritor not merged with Western, and that the cost of liquidation was established with reasonable certainty using the FDIC's own estimate, whereas such proof was lacking in other cases where restitution was denied. *See, e.g., Glendale*, 239 F.3d at 1382 (holding that savings realized by the government upon Glendale's acquisition of a failing thrift were too speculative because Glendale was only one of several potential acquirers and because the government had other options, including hiring new and better management); *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1351 (Fed.Cir.2001) (affirming trial court's denial of restitution remedy as too speculative in light of contingent liability the regulator assumed in connection with the merger); *LaSalle Talman Bank*, 317 F.3d at 1376 (stating that the

avoided liquidation costs are "at most a paper calculation" and "are not a usable measure of either cost to the thrift or benefit to the government, and thus not an appropriate threshold for restitution damages"); *Granite Mgmt. Corp. v. United States*, 416 F.3d 1373, 1381 (Fed.Cir.2005) ("The trial court determined that the government had other ways to deal with the problem, such as arranging for the sale of the thrifts to another buyer.").

Slattery relies especially on the government's response during this litigation to Plaintiffs' Request for Admission No. 6, which asked the government to admit that "[i]f the FDIC was unable to find a merger partner for Western in or about the Spring of 1982, the agency recognized that either it or the State of Pennsylvania would have to seize and/or liquidate the institution." The government responded: "Admits that the FDIC, in the hypothetical circumstances stated, would have terminated Western's deposit insurance and that the State of Pennsylvania would have appointed a receiver to liquidate the institution." Slattery also points to abundant record evidence that, at the time of the Meritor deal, the FDIC was only days away from taking action to liquidate Western, and that no viable alternative to the Meritor merger was available. Slattery points out that the estimate of $696 million that it would have cost the FDIC to liquidate Western came from the FDIC itself, using the methodology it has consistently applied. Slattery asserts that this direct evidence of the liquidation costs the FDIC would have incurred, and the admitted fact of imminent action but for the Meritor merger, sufficiently distinguish this case from the more speculative restitution claims discussed in other cases.

Slattery also takes issue with the Court of Federal Claims' finding that the $294 million that the government incurred in assisting the merger should be subtracted from the saving of $696 million. Slattery states that the shareholders are entitled to the full amount it would have cost the FDIC to liquidate Western, citing Dr. Finnerty's analysis that the support the FDIC provided in connection with the merger actually resulted in a net gain to the government in the amount of $67.341 million (the amount awarded as non-overlapping restitution), rather than a cost of $294 million as originally estimated by the FDIC.

Slattery also requests that, in awarding restitution damages, the award should include the investment gains the government realized on the monies it avoided expending when Meritor agreed to merge with Western, on the theory that "if you take my money and make money with it, your profit belongs to me." *Nickel v. Bank of Am. Nat'l Trust & Savings*, 290 F.3d 1134, 1138 (9th Cir.2002).[8] The government responds that such a disgorgement award would constitute an award of prejudgment interest, in violation of 28 U.S.C. § 2516(a) ("Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof."). *See also Int'l Bus. Machines Corp. v. United States*, 201 F.3d 1367, 1370 (Fed. Cir.2000) ("[T]he United States is immune to claims for interest unless Congress has

---

8. The *Nickel* case was an action for breach of fiduciary duties, where disgorgement awards are more common. *See, e.g.,* E. Allan Farnsworth, *Your Loss or My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract*, 94 Yale L.J. 1339, 1356 (1985) ("The more significant distinction between fiduciary obligations and contractual ones is remedial—the disgorgement principle applies to breach of a fiduciary obligation while the expectation principle applies to a breach of contractual obligation.").

waived immunity by expressly consenting to an award of interest.").

The government disputes the trial court's finding that but for the Meritor deal, liquidation would have immediately followed, minimizing its own Admission to this effect. The government cites the FDIC's policy to avoid liquidating mutual savings banks, and states that despite Slattery's evidence to the contrary, other options remained available to the FDIC. However, the government has not shown clear error in the trial court's finding that but for the Meritor merger, liquidation would have resulted, for this finding was supported by abundant evidence at trial.

The government argues that this case is not meaningfully different from *Glendale* and other cases in which this court rejected restitution theories based on "liquidation savings" in various factual situations. The government stresses that the FDIC remained contingently liable for insuring the merged bank's deposits even after the merger. The government contends that a simple calculation of foregone costs at the moment of the merger, based on contemporaneous estimates, does not accurately reflect an actual "benefit" conferred on the breaching party by the non-breaching party; rather it represents a mere "speculative assessment of what might have been," *Glendale*, 239 F.3d at 1382. The government argues that restitution is only appropriate where a transaction can be "unwound," whereas here both parties performed the contract for several years before the first alleged breach in 1988. The government argues that various financial incentives of the Merger Agreement were fully performed before any asserted breach, and that the transaction simply cannot be unwound to return the parties to their *ex ante* positions. The government states that since it is impossible to return the parties to the position they would have occupied absent the contract, as discussed in *LaSalle Talman Bank, FSB v. United States,* 45 Fed.Cl. 64 (1999), *aff'd in relevant part,* 317 F.3d 1363 (Fed.Cir.2003), awarding as "restitution" the government's purported immediate savings would be an inappropriate attempt to "unscramble the egg," *id.* at 77. Slattery responds that the amount of the liquidation costs the FDIC avoided by enticing Meritor to merge with Western was established with far more certainty than in the cited *Winstar*-related cases.

On reviewing the arguments in light of precedent and the undisputed and found facts, we agree with the government that restitution measured by the government's saved liquidation cost is not appropriate in this case. The benefits to the FDIC, in avoiding liquidation and saving the cost of liquidation, reflect the motivation of the FDIC to encourage and facilitate the merger. However, these savings were not obtained at expense to Meritor, and the FDIC continued to bear risk against its insurance fund after the merger, for it continued to insure deposits in the merged bank. Moreover, the positions of both parties changed during the six years of performance without allegation of breach, with Meritor experiencing profits and growth as well as losses and retrenchment. By analogy to the various cases that have discussed this question in the context of savings and loan institutions, the subsequent breach of the agreement to recognize goodwill as regulatory capital was too far removed, in damages theory, from the initial savings to the government in entering into the salvage arrangement. In the judicial search for just remedy for economic situations sought by neither party, the damages awards have generally been based on reliance and lost value. We affirm the denial of the requested award of damages measured by the savings achieved by the FDIC upon averting liqui-

dation of Western by the 1982 merger with Meritor.

### F. Clarification of the Judgment

The judgment of the Court of Federal Claims awards the damages to "the plaintiffs." The government argues that the judgment is incorrect, if taken to mean that the damages are to be paid directly to the plaintiff shareholders, because this case proceeded as a derivative action on behalf of Meritor. *See Motion to Dismiss Ruling,* 35 Fed.Cl. at 183 (stating derivative nature of the suit). The FDIC had repeatedly refused shareholder requests to bring this action on behalf of Meritor, although the FDIC was appointed receiver immediately upon the bank's seizure.

The FDIC filed a brief on this appeal as *amicus curiae,* pressing the position that because of the derivative nature of the suit, the damages award must be paid to the FDIC in its capacity as receiver for Meritor. *Cf. First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1293 (Fed.Cir.1999) ("the only claim that can be heard is the corporation's contract claims against the government and the only beneficiary of any relief will similarly be the corporation"). The FDIC points out that at post-trial argument in the Court of Federal Claims the court recognized that all parties had agreed that the award would be paid through the receivership. The FDIC also states that although it refused to bring or join in this action, it could have been added as an involuntary necessary party, pursuant to Court of Federal Claims Rule 19(a). *See, e.g., Suess v. United States,* 535 F.3d 1348, 1357 (Fed.Cir.2008) (noting the trial court's joinder of the FDIC as a party).

The FDIC argues that while the wording of the judgment lacks clarity, it can reasonably be construed as ordering that the damages be paid to the Meritor receivership because this action was pursued derivatively on behalf of Meritor. Both Slattery and the government agree that the judgment should be paid to and distributed by the receivership.[9] Slattery Br. 63 ("FDIC is correct that any final judgment in this case will be paid by the United States to FDIC–Receiver [for Meritor]"); Gov't Reply Br. 56 ("Any judgment upon Meritor's derivative claims must be paid to the FDIC–Receiver."). On remand, the Court of Federal Claims may clarify its judgment if needed or appropriate to resolve this aspect.

The FDIC also asks this court to order that the judgment be paid from general appropriated funds in the Judgment Fund of the United States, and not from the FDIC's deposit insurance fund. The FDIC points out that 28 U.S.C. § 2517(a) provides that "every final judgment rendered by the United States Court of Federal Claims against the United States shall be paid out of any general appropriation therefore" with an exception that is not here applicable. The FDIC states that language in the government's brief might be construed differently. Any difference of opinion within government entities is not the concern of these claimants or this court.

### G. Distribution Net of Receivership Deficit

■ The government argues that the Court of Federal Claims exceeded its authority in ordering that the damages be

---

9. The only disagreement is from the Intervenors, who were shareholders at the time of Meritor's seizure but are no longer shareholders, as discussed *post.* The Intervenors argue that the judgment should be construed to award the damages directly to those who owned shares at the time of Meritor's seizure. However, this issue of distribution is not before us.

paid "net of any receivership claims" and thus "outside the statutory distribution scheme as advanced by the government in 12 U.S.C. § 1821(d)(11)." *Dismissal of Intervenors' Complaint*, 73 Fed.Cl. at 531 (final order); *Amended Final Order*, 98 A.F.T.R.2d at 2006–8303, 2006 WL 3930812. Section 1821(d) establishes the priority of distribution of funds held by the receiver for an insured institution. Sub-paragraph (11) of that provision, titled "Depositor preference," gives preference first to the receiver's expenses, then to depositors and creditors of the institution, and then to the shareholders.[10] The government maintains that this requires that the FDIC as receiver must recover its asserted "receivership deficit" with priority over any other distribution. The question is whether the Court of Federal Claims had authority to issue this judgment, or whether the court is barred from including in its judgment any order relating to the further disposition of the amount awarded as damages.

The court explained: "The Government caused Meritor to be forced into receivership which it would otherwise not have been forced into and it is well settled that a breaching party has to put the party in the same position as it would have been but for the breach. Therefore, the Government is liable for any receivership deficit." *Amended Final Order*, 98 A.F.T.R.2d at 2006–8303, 2006 WL 3930812. It is noteworthy that the damages award was obtained in litigation brought by the bank's shareholders when the FDIC refused to act. The court concluded that the receivership deficit, insofar as accrued by the FDIC as breaching party, is not to be charged against the damages awarded for the breach. We agree that the trial court acted within its discretion, in declining to impose on the shareholders the costs incurred by the breaching party.

We affirm the ruling of the Court of Federal Claims that the FDIC's asserted charges for administering the bank after its seizure shall not be charged to the damages award, for these charges were the consequence of the FDIC's breach. This ruling did not "restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver," 12 U.S.C. § 1821(j), but is directed at assuring the integrity of the judgment for breach of contract. The FDIC, having refused to act or participate in this action on behalf of Meritor, does not have standing to object to the judgment of the Court of Federal Claims on this appeal.[11]

## IV. INTERVENORS' APPEAL

Slattery's initial complaint included a class action count, and listed all sharehold-

---

10. Subparagraph (11)(A) states:

Subject to section 1815(e)(2)(C) of this title, amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:

(i) Administrative expenses of the receiver.

(ii) Any deposit liability of the institution.

(iii) Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).

(iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).

(v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

11. The Court of Federal Claims also ruled that a "tax gross-up" is appropriate, in light of our ruling in *Home Savings of America, FSB v. United States*, 399 F.3d 1341 (Fed.Cir. 2005). This aspect of the judgment is not appealed.

ers of Meritor as of December 11, 1992, the date of the bank's seizure. *Motion to Dismiss Ruling,* 35 Fed.Cl. at 181. Simultaneously with the filing of the initial complaint, Slattery moved to certify this class. The Roth Intervenors owned 1.7 million shares of Meritor stock at the time of seizure, representing about 5% of the outstanding stock. *Dismissal of Intervenors' Complaint,* 73 Fed.Cl. at 529. Roth sold these shares in September 1993. In October 1996, Slattery moved to amend the complaint and redefine the class to include only Meritor shareholders as of the date of final judgment of this action, and to certify this new class. *Id.* The complaint was amended, but the motion to certify was stayed indefinitely. In light of the amendment to Slattery's complaint and the stayed request to certify a new class that would exclude Roth, Roth sought leave to intervene in the proceedings, and the trial court granted this motion. However, the court postponed consideration of Roth's claims until after final determination of Slattery's action. *Id.*

Roth's complaint in intervention concentrated on the FDIC's actions as receiver, and its failure to distribute the liquidation surplus of $181.3 million. As the Court of Federal Claims summarized:

> Intervenors advance four claims for relief based on several theories in connection with the breach of the [Merger Agreement]. Count one alleges the taking of their property by the FDIC as receiver in violation of the fifth amendment. Count two alleges that FDIC, as receiver, retained for itself Intervenors' proportionate share of a surplus remaining from the $181.3 million received from Mellon Bank after satisfaction of claims as set forth in 12 U.S.C. § 1821(d)(11)(A) causing injury to Intervenors. Count three seeks declaratory judgment that 12 U.S.C. § 1821(d)(11)(A) created an entitlement in Intervenors to a portion of any surplus from the Meritor receivership at the time of Meritor's seizure on December 11, 1992, and further seeks the creation of a constructive trust of their proportionate share of any such surplus. Count four asserts a third party beneficiary claim.

*Dismissal of Intervenors' Complaint,* 73 Fed.Cl. at 529 (footnotes omitted). Apart from the third-party beneficiary claim, which is no longer in issue, these claims all relate to actions the FDIC took in its role as receiver for Meritor. After finding liability and assessing damages on Slattery's breach of contract action, the Court of Federal Claims dismissed the Intervenors' complaint, ruling that the court lacked jurisdiction over these claims because the FDIC, in its capacity as receiver, is not "the United States" and cannot be sued under the Tucker Act. The Intervenors challenge this ruling with respect to the disposition of the liquidation surplus resulting from the breach of contract.

In dismissing the Intervenors' claims, the Court of Federal Claims relied solely on the ground that they were directed at actions of the FDIC in its capacity as receiver. The court referred to *Ambase Corp. v. United States,* 61 Fed.Cl. 794, 796–97 (2004), where the Court of Federal Claims stated that the FDIC as receiver generally is not considered the United States for the Tucker Act purposes. Roth states that this ruling is in conflict with this court's decision in *First Hartford,* 194 F.3d at 1287–88. In *First Hartford* this court held that a shareholder of a bank that had been seized by the FDIC had a property interest in the liquidation surplus from the sale of the seized bank's assets. This court concluded both that Court of Federal Claims had jurisdiction to hear claims directed to this property interest, and that the shareholder had standing to

pursue such claims. *See id.* at 1287. The shareholder's property interest arose from the statutory requirement that the FDIC pay remaining funds, after liquidation, to the failed bank's shareholders pursuant to the distribution provision 12 U.S.C. § 1821(d)(11). The Intervenors state that their claims are similarly predicated on their interest in the surplus the FDIC realized upon liquidating Meritor's assets, and that *First Hartford* confirms the jurisdiction of the Court of Federal Claims to review the FDIC's alleged mishandling of this surplus.

The government argues that *First Hartford* is not controlling because the takings counts in that case were directed to the FDIC's actions before seizure but after breaching the contract, whereas here Roth's claims are directed to the FDIC's actions after the seizure. That is not a jurisdictional distinction, for the jurisdictional question in *First Hartford,* as here, turned not on the timing of the FDIC's retention of the surplus, but on the claimant's right to these funds. The ·Court of Federal Claims in this case did not explore the larger issue of entitlement to the liquidation surplus, but simply held that the question was outside the court's jurisdiction because the failure to distribute the $181 million to the shareholders was an act of the FDIC in its role as receiver.

The record has not been developed on this specific issue, although this court has recognized the FDIC's dual role as regulator and as receiver. *See, e.g., American Capital,* 472 F.3d at 870 (affirming dismissal of complaint for breach of contract filed by the FDIC as receiver of a failed thrift association, because the thrift institution itself could not have sued, on the specified facts, for breach of contract); *Frazer v. United States,* 288 F.3d 1347, 1354 (Fed.Cir.2002) (holding that actions of the FDIC as receiver did not toll the stat-

ute of limitations running against the seized institution); *Landmark Land,* 256 F.3d at 1382 (dismissing the FDIC as receiver's claim for lack of actual controversy because the receivership owed more to another arm of the government than it could recover with its claim, but stating "we are not holding that all claims by the FDIC against the government will fail to satisfy the case-or-controversy requirement").

The courts have also recognized that the FDIC does not automatically lose its governmental status when it acts as receiver for a bank that it has seized in its governmental role. In *Auction Co. v. FDIC,* 132 F.3d 746 (D.C.Cir.1997) (*"Auction I"*), the District of Columbia Circuit discussed the proposed distinction between the FDIC in its regulator capacity and in its role as receiver when regulated banks fail, and noted that there was "no persuasive reason why the distinction makes a difference" for the statute of limitations issue in that case. *Id.* at 750 n. 1. And in *FDIC v. Hartford Insurance Co. of Illinois,* 877 F.2d 590 (7th Cir.1989), which involved determination of the proper venue for tort claims brought by an insurer against the FDIC in its role as receiver, the Seventh Circuit stated, "What is 'the Federal Deposit Corporation as receiver' other than part of the United States? To sue FDIC–Receiver is to sue those officials of the federal government who happen to be responsible for winding up the affairs of failed banks." *Id.* at 592. In *First Hartford, supra,* this court similarly recognized that whether the FDIC as receiver is "the government" depends on the context of the claim.

Here, as in *First Hartford,* the claims are asserted against the government, seeking return of the monetary surplus obtained for the seized bank. This is unlike the standard receivership situation in

which the receiver is enforcing the rights or defending claims and paying the bills of the seized bank. We conclude that as to the specific issue raised by the Intervenors, the Court of Federal Claims erred in dismissing the complaint on the theory that the FDIC is not the United States, for the FDIC's position in contracting on behalf of the United States, and its liability for breach, includes responsibility for the consequences of the breach.

The government argues that even if the FDIC is considered the United States for the purposes of the Intervenors' claims, the dismissal of these claims must be upheld on a different, statutory ground. The government cites 12 U.S.C. § 1821(d)(13)(D), titled "Limitation on judicial review," which states:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
>
> > (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver, or
> >
> > (ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver.

The government states that the only exception to this bar to judicial review appears at 12 U.S.C. § 1821(d)(6), which provides for an administrative determination of "any claim against a depository institution for which the [FDIC] is receiver," followed by adjudication in district court. The government contends that these provisions prohibit the Court of Federal Claims from hearing the Intervenors' claims, which are described as relating to the FDIC's conduct as receiver. The government cites a decision of the District of Columbia Circuit on rehearing of *Auction I*, in which that court discussed but did not decide the question of judicial review under § 1821(d)(13)(D). *Auction Co. v. FDIC*, 141 F.3d 1198, 1199 (D.C.Cir.1998) ("*Auction II* "). The D.C. Circuit in *Auction II* discussed that § 1821(d)(13)(D), read together with § 1821(d)(6), appears to impose a standard exhaustion requirement, but that such a reading would leave some claims unreviewable, and concluded that such a result appears to be contrary to the intention of the enactment of these provisions as part of FIRREA. 141 F.3d at 1200. The government does not resolve these points of statutory interpretation, instead citing parts of the *Auction II* court's discussion of the potential bar to judicial review presented by § 1821(d)(13)(D), but ignoring the parts of *Auction II* discussing Congress's intent in enacting these provisions as part of FIRREA.

Other courts have considered the scope of § 1821(d)(13)(D). For example, in *Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269, 1274 (10th Cir.1994), the court stated that in adopting the administrative review regime codified at § 1821(d), "Congress had in mind creditor and related claims arising before an institution enters receivership," *id.* at 1274, and concluded that "the term 'claim' as used in § 1821(d)(13)(D) should be interpreted to exclude claims such as Homeland's arising from management actions of the [receiver] after taking over a depository institution." *Id.* The analysis in *Homeland Stores* supports the conclusion that § 1821(d)(13)(D) cannot have been intended to foreclose review of all claims arising after seizure. That is, review may be foreclosed of the FDIC's resolution of existing claims against the seized bank, but the statute is not directed to the FDIC's actions in liquidating the bank. The Intervenors challenge the FDIC's apparent retention of the

proceeds of liquidation. Although the merits of this claim were not resolved by the Court of Federal Claims, we agree with the Intervenors that the issue is not within the scope of § 1821(d)(13)(D).

This conclusion is in harmony with the *Ambase* decision of the Court of Federal Claims. In *Ambase* the court ruled that § 1821(d)(13)(D) did not bar it from hearing claims that included actions of the FDIC as receiver. 61 Fed.Cl. at 799. The case arose upon a motion requesting review by the Court of Federal Claims of the FDIC's management of the receivership of a failed thrift in order to determine the proper measure of damages, for the court had determined that the damages award would in that case be reduced by the costs of the receivership. *Id.* at 795. The court held that it had jurisdiction over this aspect of the case. The remark now quoted by the trial court, that the "FDIC is not generally considered to be the government for jurisdictional purposes in *Winstar* litigation," *id.* at 797, does not reflect the court's actual holding, for the Court of Federal Claims ruled in *Ambase* that it did have jurisdiction to review this action of the FDIC as receiver. Discussing § 1281(d)(13)(D), the court looked to the entirety of the FDIC Act to understand the meaning of this provision, and concluded that it could not mean that the plaintiffs could challenge this aspect of the FDIC's acts only in district court, for that would create an absurd situation in which the plaintiffs could only seek money damages of the disputed action in the Court of Federal Claims, but could only determine the amount of damages for that action in the district court, which can not provide relief. *Id.* at 798–99.[12] We agree with the logic of this analysis, and conclude that the Court of Federal Claims erred in dismissing the Intervenors' claims in reliance on *Ambase.* The dismissal of the Intervenors' claims on jurisdictional grounds is reversed. We express no opinion on the merits of the Intervenors' claims.

CONCLUSION

The judgment of the Court of Federal Claims is affirmed as to jurisdiction, liability, and the assessment of damages for lost value in the amount of $276 million, net of the receivership deficit, and with an appropriate tax gross-up. The judgments as to certain additional damages are reversed as discussed herein. We reverse the dismissal of the Intervenors' claims relating to the liquidation surplus, and remand for consideration of these claims to the extent that they remain at issue, and for any further proceedings as may be warranted to implement of the court's judgment.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

GAJARSA, Circuit Judge, dissenting.

I respectfully dissent from the majority's determination that the FDIC is not a non-appropriated funds instrumentality ("NAFI"). Because the FDIC qualifies as a NAFI under our precedent, I would reverse the trial court's determination that it has jurisdiction over this case and remand to the trial court with instructions to dismiss for lack of jurisdiction.

The majority holds that "[t]he Court of Federal Claims correctly ruled that the FDIC does not meet the fourth factor of the AINS test." Majority Op. at 812. In

---

12. The *Ambase* court also rejected the government's argument that the anti-injunction provision 12 U.S.C. § 1281(j) prohibited the court from reviewing the FDIC as receiver's actions, noting that the plaintiffs were seeking only monetary relief against the government, not an injunction against the receiver, so the anti-injunction provision was not implicated. *See* 61 Fed.Cl. at 799.

other words, the majority concludes that the FDIC is not a NAFI because there is no " 'clear expression by Congress that the agency was to be separated from general federal revenues' "—the fourth factor in the test we articulated in *AINS, Inc. v. United States*, 365 F.3d 1333, 1342 (Fed. Cir.2004) (quoting *L'Enfant Plaza Properties, Inc. v. United States*, 229 Ct.Cl. 278, 668 F.2d 1211, 1212 (1982)). I respectfully disagree. As we explained in *AINS:*

> The fourth factor is often the least obvious; congressional intent is not always explicit in statutory language. In the past, we have found several different statutory ways for Congress to express its intent to separate an agency from the general fund. *See, e.g., L'Enfant Plaza,* 668 F.2d at 1212 (explicit prohibition from receiving appropriated funds); *Denkler,* 782 F.2d at 1004–05 (absence of language authorizing appropriations); *id.* at 1005 (explicit statement that agency's funds shall not be construed to be government funds or appropriated monies); *Core Concepts,* 327 F.3d at 1336 (direction that all monies under the agency's control be deposited into the U.S. Treasury to the credit of that agency).

*AINS,* 365 F.3d at 1343. We then proceeded to find that the fourth factor was met in *AINS* based on the following: (1) "[t]he Mint's expenses are paid from its own revolving fund, funded through its own activities" and (2) "[t]he statute makes no provisions for appropriations ... and the legislative history indicates Congressional intent to keep the Mint self-financing and distinct from the general fund." *Id.* (citation omitted). Here, like the Mint, the FDIC's expenses are funded by its own revenue by raising fees imposed upon the member banks. *See* 12 U.S.C. § 1817(b). Moreover, the relevant statutory provisions do not provide for appropriation of general funds to defray the FDIC's

expenses. In fact, Congress strictly limited the FDIC's ability to incur obligations, *see id.* § 1825(c)(5), and expected the FDIC to make special assessments upon Deposit Insurance Fund member banks when it requires additional funds, *see id.* § 1817(b)(5). Thus, the FDIC is a NAFI.

Our decisions in three additional cases, *Denkler v. United States,* 782 F.2d 1003 (Fed.Cir.1986), *Furash & Co. v. United States,* 252 F.3d 1336 (Fed.Cir.2001), and *Core Concepts of Florida, Inc. v. United States,* 327 F.3d 1331 (Fed.Cir.2003), likewise compel a determination that the FDIC is a NAFI. In *Denkler,* we found "a clear expression by Congress that the agency was to be separated from general federal revenues" because "[t]he combination of designation of assessments on banks as the source of funds for salaries, and the absence of the conventional language authorizing funds to be appropriated, even when other sources are also looked to, accomplishes such clear expression." 782 F.2d at 1005 (internal quotation marks omitted). Likewise, in the present case, the fact that the FDIC makes assessments upon Deposit Insurance Fund member banks to provide sufficient funds for its operation, combined with the fact there is no statutory language authorizing appropriation of general funds for FDIC usage, is sufficient to demonstrate the required clear expression of Congressional intent that the FDIC is to be separated from general federal revenues. *See* 12 U.S.C. § 1817(b).

In *Furash,* when considering whether Congress intended for agency funds to be separated from general federal revenues, we noted the relevance of statutory language stating that agency funds "shall not be construed to be Government Funds or appropriated monies, or subject to apportionment for the purposes of chapter 15 of Title 31, or any other authority." 252 F.3d

at 1341. Here, the existence of similar statutory language is critical to establish and demonstrate Congress's intent that FDIC funds remain separated from general federal revenues. *See* 12 U.S.C. § 1817(d) ("Notwithstanding any other provision of law, amounts received pursuant to any assessment under this section and any other amounts received by the Corporation shall not be subject to apportionment for the purposes of chapter 15 of title 31 or under any other authority.").

In *Core Concepts,* again considering "whether Congress has clearly expressed its intent that the agency, or the particular activity that gave rise to the dispute in question, is to be separated from general federal revenues," we were persuaded by the following: (1) the fact that the agency's "enabling legislation includes no authorization of appropriations, such as is usually found in the statutory charters of governmental entities which may rely on such appropriations in whole or in any part'" and (2) the fact that "several congressional reports relating to [the agency's] operations provide evidence of Congress's own understanding that [the agency] is to operate entirely without appropriated funds." 327 F.3d at 1336–37 (internal citations omitted). Those same facts are present here and should produce the same result—a determination that the FDIC is a NAFI.

The majority's reliance on expressions that Congress intended to back FDIC deposits with the full faith and credit of the United States is misplaced and is not legally supported. *See* Majority Op. at 810. Those statements are specific to FDIC deposits and provide no support for the assertion that Congress intended to apportion general funds to pay contract judgments against the FDIC. *See Kyer v. United States,* 177 Ct.Cl. 747, 369 F.2d 714, 718 (1966) ("[T]o remain within the

framework of our jurisdiction, it is essential that the contract sued on be one which could have been satisfied out of appropriated funds.... To be actionable *in this court,* that contract must be one which, in the contemplation of Congress, could obligate public monies."). In fact, Congress's expression of a specific exception to the scheme under which FDIC expenses are to be paid by the agency's own funds demonstrates that Congress did not intend to back other obligations of the FDIC—i.e., obligations unrelated to the deposits. *See Furash,* 252 F.3d at 1341 (explaining that "a specific exception to the scheme under which [agency] expenses are not paid by appropriated funds ... does not alter the status of the [agency] as a non-appropriated fund instrumentality. Instead, it confirms that, except with respect to that specific activity, which is not at issue in this case, the [agency's] expenses are not expected to be defrayed by appropriated funds."). Moreover, the fact that the FDIC may borrow funds from the Treasury is of no moment. The FDIC is statutorily obligated to repay any borrowed funds with interest. 12 U.S.C. § 1824(a). Indeed, the FDIC must submit a repayment plan and demonstrate that its income will be sufficient to repay the loan as scheduled. *Id.* at § 1824(c). Thus, the statutory provisions allowing the FDIC to borrow from the Treasury give no indication that Congress intends to appropriate general federal funds to defray FDIC expenses. In contrast, the majority relies on the full faith and credit of the United States to waive the sovereign immunity of the United States, but the only basis for its action is "the strong commitment to the nation's banking system and for protection of deposits." Majority Op. at 811. However, regardless of the fact that the full faith and credit of the United States may be used to support the insurance function of the FDIC, it cannot legally waive the

sovereign immunity of the United States because the statutory scheme does not allow for appropriated funds to be used for the FDIC's expenses. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed") (internal citations omitted).

For the foregoing reasons, the FDIC is a NAFI, and the Court of Federal Claims lacks jurisdiction to consider the present action. Thus, I respectfully dissent from the majority's opinion.